TERENCE T. EVANS, Circuit Judge.
 

 This appeal raises two issues: an interesting one regarding the use of telephonic testimony, and a pedestrian one regarding a claimed violation by the government of its obligation to disclose evidence to the defense under
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
 

 Someone robbed the Guaranty Bank located in the Grand Avenue Mall in downtown Milwaukee, Wisconsin, on March 14, 1994. The government thought the robber was Christopher Hamilton so a criminal complaint was lodged against him. The defense then claimed Hamilton was not competent to proceed so Magistrate Judge Aaron E. Good-stein scheduled a competency hearing pursuant to 18 U.S.C. §§ 4241 and 4247(d) and appointed a psychiatrist, Dr. William Crowley, to examine Hamilton. The judge also ordered Hamilton committed to a federal medical center for additional psychiatric examination. Hamilton was then evaluated for five weeks at the Federal Medical Center in Springfield, Missouri.
 

 At the hearing, which was held on September 1,1994, Dr. Crowley testified that Hamilton was not competent to stand trial. Dr. Crowley based his opinion on one meeting with Hamilton that lasted about 20 minutes, statements from guards at the Waukesha County Jail that while held there Hamilton was disruptive and reported hearing voices, and a telephone conversation Crowley had with Hamilton’s estranged wife Veronica, who said Hamilton in the past reported hearing voices telling him to kill her. Dr. Crowley, who was Hamilton’s only witness at the hearing, also said that when he attempted to interact with him, Hamilton would not respond verbally or maintain direct visual contact. This behavior, the doctor said, was consistent with psychosis — “a substantial disorder of thought that grossly impaired his capacity to meet the ordinary demands of life.” The government did not share this view of Hamilton’s mental capacity. It took the position that he was fully able to proceed on the charge against him.
 

 The government presented two expert witnesses at the hearing: Dr. Richard Frederick, a clinical psychologist at the medical center in Springfield, and Dr. Barry Aulten-berg, a psychiatrist associated with Trinity Memorial Hospital in Cudahy, Wisconsin. Both gave their opinions that Hamilton did not suffer from a mental disorder. Each testified to his belief that Hamilton presented a prime example of a “malingerer”— someone faking mental illness.
 
 [1]
 

 Dr. Frederick based his opinion on his and his staffs evaluation of Hamilton from June 10 to July 17, 1994. During Hamilton’s stay in Springfield Dr. Frederick conducted numerous interviews and tests and reviewed Hamilton’s medical history. Dr. Frederick thought Hamilton was “very badly faking a mental disorder” and that he understood the proceedings against him, could assist in his defense, and was competent to stand trial.
 

 Dr. Aultenberg treated Hamilton from November 15 to December 5, 1993. Dr. Aulten-berg explained that Hamilton was admitted to Trinity with a cocaine problem and that he claimed to be suicidal and having hallucinations. By the end of Hamilton’s three-week stay at Trinity, Dr. Aultenberg was convinced that Hamilton’s conduct was consistent with malingering. The doctor thought Hamilton wanted a place to stay and that he wanted to avoid stressful situations. The doctor described Hamilton as “very intelligent,” “highly manipulative,” and he also thought Hamilton pretended to be suicidal in order to get admitted to Trinity.
 

 Finally, the government offered the testimony of Special Agent John Horton of the United States Secret Service. Exactly why Agent Horton could not attend the hearing in person is unclear, but he instead testified via
 
 *-1081
 
 telephone from Andrews Air Force Base, which is in the Washington, D.C. area. Horton had interviewed Hamilton’s wife Veronica on March 9, 1994, while investigating a threat Hamilton made against President Clinton. According to Horton, Veronica said her husband was not genuinely ill and because no one in his family could tolerate him anymore he planned to get committed any way he could in order to have a place to stay at night. Veronica herself did not testify at the competency hearing. Horton’s testimony was offered to impeach her statements to Dr. Crowley because his opinion, in part, was based on what she had said about Hamilton.
 

 The defense objected to Horton’s testimony because it was hearsay and because it was presented over the telephone.
 
 [2]
 
 Judge Good-stein overruled the objections, stating that he believed impeaching Veronica’s statements to Dr. Crowley was proper and that Horton had been called out of the country for an emergency “[a]nd now we’re trying to do the next best thing.”
 

 In addition to hearing the testimony, Judge Goodstein reviewed Hamilton’s medi- ’ cal records'. The records-show repeated hospitalizations and references to hearing voices, suicidal thoughts, and diagnoses of psychosis. Some of the records, though, also indicate various doctors’ suspicions and/or conclusions that Hamilton was malingering.
 

 Judge Goodstein found Hamilton competent to stand trial. In his written decision he placed no importance on Agent Horton’s testimony. Instead, he said the
 

 pivotal factor in evaluating Christopher Hamilton is the amount of time devoted to the task. Initially, Hamilton knows what to say to obtain hospital admission_ The pattern then becomes familiar; Hamilton refuses to cooperate with the staff as regards any treatment and he leaves the facility before any extensive evaluation can be conducted.
 

 This is not a case of one doctor being correct and the other wrong in their re-speetive evaluations. This is a ease of being able to have sufficient time to study Christopher Hamilton, in order to reach the conclusion that he is not psychotic. Dr. Crowley simply did not have the time to fully evaluate the defendant as did Dr. Frederick and Dr. Aultenberg.
 

 After the competency decision a grand jury indicted Hamilton on one count of bank robbery in violation of 18 U.S.C. § 2113(a). A jury trial before Chief Judge J.P. Stadt-mueller resulted in a guilty verdict, and Hamilton was later sentenced to serve a term of 96 months.
 

 The Confrontation Clause of the Sixth Amendment provides that in all criminal prosecutions, an accused has the right to be “confronted with the witnesses against him.” The Supreme Court has interpreted the clause to guarantee a defendant a face-to-face meeting with witnesses appearing before the trier of fact.
 
 Coy v. Iowa,
 
 487 U.S. 1012, 1016, 108 S.Ct. 2798, 2800-01, 101 L.Ed.2d 857 (1988). Several purposes are served by requiring face-to-face, in-eourt testimony. For one thing, face-to-face confrontation ensures the reliability of the evidence by allowing the trier of fact to observe the demeanor, nervousness, expressions, and other body language of the witness. In-court testimony also impresses upon the witness the seriousness of the matter and ensures that statements are given under oath.
 
 California v. Green,
 
 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970). Personal appearance also helps assure the identity of the witness, that the witness is not being coached or influenced during testimony, and that the witness is not improperly referring to documents.
 

 Although the Confrontation Clause generally requires face-to-face confrontation, the requirement is not absolute.
 
 Maryland v. Craig,
 
 497 U.S. 836, 849-50, 110 S.Ct. 3157, 3165-66, 111 L.Ed.2d 666 (1990). Specifically, the Supreme Court has carved out a narrow exception when (1) denial of face-to-face confrontation is necessary to further
 
 *-1080
 
 an important public policy, and (2) the necessities of the case require.
 
 Id.
 
 at 850, 110 S.Ct. at 3166. And it is unclear whether the Confrontation Clause applies to pretrial competency hearings. Regardless how that question is answered, the right to confront witnesses at a competency hearing specifically arises under 18 U.S.C. § 4247(d), which says:
 

 At a hearing ordered pursuant to this chapter the person whose mental condition is the subject of the hearing ... shall be afforded an opportunity to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine witnesses who appear at the hearing.
 

 In his briefs, Hamilton notes no distinction between his Sixth Amendment rights and his rights under § 4247, and the government, in its brief, notes the difference but does not discuss it other than in reference to the harmless error standard. We think the difference may indeed be important — does § 4247(d) merely reiterate the Sixth Amendment right to confrontation, or was it passed because the Sixth Amendment right does not apply to competency hearings? We elicited more discussion of this matter by the parties at oral argument but the topic has not been fully explored.
 

 Whether telephonic testimony satisfies a defendant’s right to confrontation— ■under either the Sixth Amendment or § 4247 — is an issue of first impression in this circuit.
 
 [3]
 
 Other courts, however, have receñid ly addressed telephonic testimony during trial. In
 
 United States v. Jacobs,
 
 97 F.3d 275 (8th Cir.1996), the government’s primary witness at trial was pregnant and close to her delivery date. During cross-examination the witness had to go to the hospital and the court was told she would be hospitalized for a week. Defense counsel asserted that he had not yet reached the crux of his cross-examination when the witness left and that it was crucial for the jury to be able to observe her demeanor when he did. He requested a continuance until she could return. Despite the request and the defendant’s objections, the judge had counsel cross-examine the witness by telephone, and the jurors heard her testimony through speakers in the courtroom.
 

 The Eighth Circuit determined that given the facts in
 
 Jacobs
 
 it would not “endorse cross-examination via telephone either generally or in this particular criminal case.” Importantly, the court noted that the trial judge failed to make findings that could have arguably supported the procedure. The court concluded:
 

 Although [the defendant’s] arguments might wield less power if the jurors, defendant, and defense counsel were able to view by video monitor the witness’s demeanor and “body language” that accompanied her responses, we are reluctant to • tolerate even these technological variations on “face-to-face” confrontation except when necessity or waiver have been demonstrated.
 

 ... We hold, therefore, the district court' erred when it substituted cross-examination via telephone for in-person cross-examination in open court without identifying the important state interests and hearing evidence to determine the specific necessities of this case that justified abridgement of Jacobs’s constitutional right to confront his accuser face to face.
 

 97 F.3d at 282-83 (citations omitted).
 

 In the trial reviewed in
 
 Topping v. People,
 
 793 P.2d 1168 (Colo.1990), a physician moved from Colorado to Kentucky after examining the victim. The doctor, however, was allowed, over the defendant’s objection, to testify by telephone regarding the examination and her opinion that the victim had been sexually assaulted. The doctor had been subpoenaed and would have appeared if re
 
 *-1079
 
 quired to do so, but the trip to Colorado would have been very inconvenient. The Supreme Court of Colorado concluded that Topping’s right to confrontation had been violated, stating:
 

 Neither the People’s desire to minimize witness inconvenience nor the trial court’s interest in the application of electronic communication technology to the judicial process, however laudable such concerns might be, constitutes a state policy of sufficient substance to justify abridgment of Topping’s sixth amendment right to confront Dr. Hawes face-to-face when she testified against him.
 

 793 P.2d at 1172.
 

 Although these eases help explain the Sixth Amendment right to confrontation in regard to telephonic testimony during a trial, such rigorousness may not be necessary in the setting of a pretrial competency hearing. The Fourth Circuit has held that postconviction mental competency hearings under 18 U.S.C. § 4245, to which § 4247(d) also applies, can be conducted by means of video conferencing.
 
 United States v. Baker,
 
 45 F.3d 837 (4th Cir.),
 
 cert. denied,
 
 — U.S. —, 116 S.Ct. 194, 133 L.Ed.2d 130 (1995). In
 
 Baker,
 
 the court noted that the Judicial Conference of the United States had authorized the Eastern District of North Carolina to conduct a pilot project using video conferencing. The government filed a motion pursuant to § 4245 to determine the mental condition of Baker, an inmate at FCI-Butner in North Carolina, and the district court, over Baker’s objections, decided to use video conferencing for the commitment hearing. Two locations were conferenced together: in a room at FCI-Butner were Baker, his appointed attorney, the government’s witness (a doctor at FCI-Butner), and various others; in the courtroom in Raleigh were the judge, the prosecutor, the court reporter, the deputy clerk, the federal public defender, and spectators. Each location had a video monitor and two cameras; the pictures on the monitors were controlled by the judge in the courtroom and Baker’s attorney at FCI-But-ner. The government offered only one witness — the doctor in the conference room at FCI-Butner. Baker put on no evidence but made a brief statement.
 

 The Fourth Circuit found no constitutional violation by the use of the video conferencing. Because the court recognized that commitment hearings are actually civil matters, the Sixth Amendment’s right to confrontation did not apply. The only constitutional issue involved was Fifth Amendment due process, which was not infringed. Although the court acknowledged that due process itself entitled Baker to some right to confront and cross-examine witnesses, the court determined that the different goals of criminal proceedings versus hearings to determine mental competency allow the right of confrontation provided in commitment hearings to be less extensive than the counterpart Sixth Amendment right:
 

 The goal of a criminal proceeding is to uncover the truth.... The rights of cross-examination and confrontation ... are all directed toward this goal. In such an undertaking, the finder of fact is called upon to determine the veracity of the testifying witnesses based,
 
 inter alia,
 
 upon the witnesses’ demeanor while testifying.
 

 As compared to the goal of a criminal trial, the goal of a commitment hearing is far different: whether the respondent is mentally competent. This determination is made by the court and is based primarily upon the opinions of experts proffered by the government and the respondent. The expert opinions will not differ factually but only in their theoretical premises. As a result, to whatever extent the opinions are delivered by way of oral testimony, the court will determine which experts’ opinion it finds more persuasive based not upon the demeanor of the experts while testifying, but upon the qualifications of the experts, and the substance and thoroughness of the opinions offered.
 

 45 F.3d at 844-45 (citations omitted).
 

 The Fourth Circuit also held that the video conferencing procedure did not violate Baker’s rights under § 4247(d) because the statute affords respondents at commitment hear
 
 *-1078
 
 ings no greater protection than does the Due Process Clause.
 
 Id.
 
 at 847 — 48.
 
 [4]
 

 If we accept the Fourth Circuit’s reasoning (and today, for reasons we will get to soon, we need not decide the issue), the question still remaining is whether due process and § 4247(d) confrontation rights differ between a postconviction competency hearing and one held
 
 pretrial.
 
 Cases to aid such an analysis are few and inconsistent. In the criminal pretrial setting, the Supreme Court of Appeals of West Virginia determined that at a hearing regarding transfer of a juvenile to criminal court, the Sixth Amendment right to confront witnesses applied and was violated when a critical witness, who was not “unavailable” pursuant to the rules of evidence, was permitted to testily by telephone.
 
 State v. Gary F.,
 
 189 W.Va. 523, 432 S.E.2d 793 (1993). The Supreme Court of Iowa, however, upheld the use of telephonic testimony during a suppression hearing because the witnesses were properly sworn before they testified and were thoroughly cross-examined.
 
 State v. Aldape,
 
 307 N.W.2d 32 (Iowa 1981). Although not specifically mentioned as a basis for the ruling, we note that the defendant and his counsel in
 
 Aldape
 
 agreed to that method of taking testimony, a fact that by itself probably obviates any problem because confrontation rights, like other rights, can be waived.
 

 Even though we have just spent some time discussing the issues, we nevertheless, in this case, decline to decide whether the Sixth Amendment applies to a pretrial competency hearing or what § 4247(d) itself requires. We instead hold that assuming,
 
 arguendo,
 
 the Sixth Amendment applies to Hamilton’s pretrial competency hearing, any error in admitting Agent Horton’s telephonic testimony was harmless.
 

 To hold a federal constitutional error harmless we must find the error harmless beyond a reasonable doubt — that is, no reasonable doubt exists that the error affected the decision.
 
 Delaware v. Van Arsdall,
 
 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986);
 
 United States v. McKinney,
 
 954 F.2d 471, 475 (7th Cir.),
 
 cert. denied,
 
 506 U.S. 1023, 113 S.Ct. 662, 121 L.Ed.2d 587 (1992). Hamilton argues that admitting the telephonic testimony materially harmed him because it undercut the credibility of his sole witness. Dr. Crowley had three bases for his opinion, however. Even though Dr. Crowley said his opinion could have changed if Veronica had told him Hamilton was not mentally ill and was a liar who would say anything to have a place to stay, the other bases for his opinion were brought into question for reasons having nothing to do with Agent Horton’s testimony. Dr. Crowley admitted that in order to identify whether a patient is malingering or truly mentally ill, a doctor should compare the reported symptoms of psychosis or paranoia, for instance, to the patient’s actual behavior, but that due to Hamilton’s lack of interaction with him during their meeting Dr. Crowley really did not have an opportunity to do that. Dr. Crowley conceded that the only behavior observations he had to go on were those reported by the correctional officers in the eounty jail and that more personal observations of a patient could cause his diagnosis of psychosis to change.
 

 Given hypothetical behaviors based on Hamilton’s own actions, Dr. Crowley indicated that his opinion might have been different. For instance, Dr. Frederick, a treating psychologist as well as an expert witness, testified that while at the Federal Medical Center, Hamilton pointed to a bank surveillance photograph in his possession and said the person robbing the bank in the photo did not look like him because of the difference in skin tone. When asked hypothetically if such a fact would cause him to alter his opinion, Dr. Crowley stated that “[i]f he made a comment like that ... within a day or two that I saw him it would certainly raise some questions in my mind, yes.” Dr. Frederick also stated that he witnessed Hamilton discussing grand jury testimony in a rational manner with another inmate known to do legal research in the facility’s law library. When asked whether interaction between
 
 *-1077
 
 Hamilton, acting in an intelligent manner, and another individual would have changed his diagnosis, Dr. Crowley said that if he “had observed what appeared to be a rational interaction with another individual ... within a short period of time that I examined him, yes, that also raise[s] questions.”
 

 In addition to Dr. Crowley’s own conces-' sions about these weaknesses of his diagnosis, Judge Goodstein had before him extensive observations by Drs. Frederick and Aultenberg. Dr. Frederick interviewed Hamilton for 10 minutes on June 10, 1994. The doctor then saw him several times the following week and conducted a 2-hour interview with Hamilton on June 17. Altogether, Dr. Frederick believed that he spoke with Hamilton about 10 to 15 times. Of course, other staff at the Federal Medical Center observed Hamilton as well during his five-week stay at the Federal Medical Center and reported to Dr. Frederick. Dr. Frederick also conducted various psychological tests with Hamilton. According to Dr. Frederick, Hamilton’s results on these tests were so far below what would be expected from someone with an impairment that “you can make a pretty good judgment that he’s not being cooperative.” For example, on one test, which had 60 statements involving symptoms of psychosis that the test subject could endorse or reject, a typical psychotic would endorse 10 or 15 of the statements according to Dr. Frederick. Hamilton endorsed 41, “which you wouldn’t even see if he had just randomly gone through the test and picked out statements or I would see it almost never.... [S]o the conclusion was that he had intentionally endorsed these so-called crazy items to present himself as psychotic.” Dr. Frederick felt that from the first interview, Hamilton was “very badly faking a mental disorder” because he acted as if he could not comprehend what Dr. Frederick was asking, which was not consistent with his physical functioning. For example, Hamilton did not know his name or why he was at the facility, yet ate and slept just fine, used the bathroom without any disorientation, and kept his room very neat — things a person with true mental illness and confusion likely would not bé able to do.
 

 Dr. Frederick provided Judge Goodstein with factual data that the judge could assess for himself, as well. For instance, upon Dr. Frederick’s return from a couple weeks off, he learned that Hamilton had hung pictures of his family on a bulletin board in his room. When Dr. Frederick approached, Hamilton began to act in a dazed and confused fashion and claimed not to know who the people were from the photographs. The next day, Hamilton let slip that he had a picture of his wife Veronica and had telephoned her. Dr. Frederick later observed Hamilton playing cards with other inmates and interacting with no evidence of impairment. Finally, near the end of his stay, Hamilton began to act appropriately and showed no impairment at all when Dr. Frederick spoke with him.
 

 Dr. Aultenberg testified that he and his staff evaluated Hamilton on a daily basis for the three weeks that Hamilton was at Trinity. Dr. Aultenberg himself met with Hamilton 6 days a week for 20 to 40 minutes each day. According to Dr. Aultenberg, during tests Hamilton showed no memory impairment, had .no difficulty with abstract thoughts, and was “a rather intelligent young man.” Dr. Aultenberg felt that Hamilton did not suffer from any mental disease, and instead suffered from passive aggressive personality disorder — not a mental illness but a behavior pattern — and drug addiction. The doctor believed that whenever Hamilton encountered stress at home or with his family, instead of confronting the problems, he would have episodes of suicidal gestures to get himself into the hospital and out of the stressful situation. Dr. Aultenberg believed that at the time of his stay at Trinity Hamilton would have been able to understand the nature of legal action — “[tjhere were very few things he didn’t understand.” Hamilton knew the concept of punishment and would cooperate in the hospital to avoid it, knew how to approach staff in order to get something he wanted and, when he did not want to cooperate any more, left the facility because the secondary gain had disappeared for him. Dr. Aultenberg testified that a psychologist at Trinity also independently concluded that Hamilton gave an “unconvincing portrayal of a schizophrenic.”
 

 Judge Goodstein, we think, did not base his decision regarding Hamilton’s competen
 
 *-1076
 
 cy on Agent Horton’s testimony. Instead, the judge analyzed all of Hamilton’s medical records (which Dr. Crowley did not even do) and focused on the difference between Dr. Crowley’s short interview with Hamilton versus the more extensive contact between Hamilton and Drs. Frederick and Aulten-berg. We think the magistrate judge correctly determined that the most important factor regarding the expert opinions was the length of time each expert had to observe and interact with Hamilton. Altogether, the longer evaluations indicated a pattern of malingering rather than true incompetency. Thus we find that due to the overwhelming evidence of malingering and competency, the admission of Horton’s testimony, even if constitutional error, was harmless beyond a reasonable doubt.
 

 Although we refrain from deciding today whether the Sixth Amendment right to confrontation applies to a pretrial competency hearing, we note that if it did, error probably occurred in this case.
 
 Craig
 
 provides that denial of confrontation is appropriate only when public policy is furthered and when necessary for the particular ease, and requires a clear identification by the trial court of those matters.
 
 Craig,
 
 497 U.S. at 855-58, 110 S.Ct. at 3168-70. The magistrate judge here made no such findings. The fact that Horton was sent to Andrews Air Force Base may have constituted necessity and public policy may have been furthered, but we cannot tell based on this quiet record.
 

 We believe that unless the parties have agreed to the procedure, at the very least a thorough record must be made of the reasons causing video-phone testimony, or conventional telephonic testimony, to be used, so a reviewing court can evaluate whether any possible exception to the defendant’s confrontation rights applies. Here, the magistrate judge took no evidence nor questioned Horton in any way on the record regarding his unavailability. It seems that the judge merely relied on the prosecutor’s statement that Horton was called out of town on an emergency. Regardless whether the Sixth Amendment or a relaxed standard applied at the competency hearing regarding the right to confront witnesses, more than that should be required before
 
 any
 
 right of confrontation is abrogated. Although in hindsight we find it hard to fault the experienced magistrate judge since Agent Horton testified to such a collateral matter and the admission of the testimony, even if erroneous, was harmless, these facts were not known prior to the taking of the testimony, and more inquiry and findings regarding Horton’s absence should have been made.
 

 Hamilton’s remaining argument on appeal can be addressed in short order.
 

 During the trial the government relied heavily on the testimony of Jason Painter, the teller at the Guaranty Bank who was robbed. In his testimony Painter described certain physical characteristics of the bank robber and how Hamilton matched up to those characteristics. Painter related that, pursuant to instructions he received during training as a teller, he wrote down a description of the robber’s features immediately after the crime. Painter said that he gave the description to a Milwaukee police officer.
 

 At the end of the presentation of all evidence and before the case was sent to the jury for deliberations, Hamilton’s attorney moved to strike Painter’s testimony, which included his identification of Hamilton as the robber, because the defense was not given this particular written description which, the defense claimed, ■ could potentially impeach Painter’s trial testimony. In response, the government maintained that it had never received the document from the police. The government’s attorney indicated that he had cheeked with the officers at the Milwaukee police department and no one could find a copy of the description. None of the officers involved testified at the time. The government’s attorney stated that if called to testify, however, the officer in charge of this bank robbery file would testify to the same and add that it was not standard procedure for the police to ask for such forms after a .robbery.
 

 The motion to strike was denied, the district judge indicating that it was clear the government did not have the form, and, more importantly, Painter did not rely on the document in preparing his testimony or while on the stand. Moreover, said the judge, the defense had been given funds for an investigator, and “any investigator worth his or her
 
 *-1075
 
 salt would have asked Mr. Painter had he given any statements and this matter perhaps could have been addressed a long time ago.”
 

 Brady v. Maryland,
 
 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1968), requires that the government provide a defendant with exculpatory evidence within the government’s knowledge or control “where the evidence is material either to guilt or to punishment,” irrespective of the prosecutor’s good or bad faith. Impeachment evidence falls within the
 
 Brady
 
 rule as evidence favorable to the accused.
 
 United States v. Bagley,
 
 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). Nondisclosure of material exculpatory evidence, including impeachment evidence, violates a defendant’s due process right to a fair trial.
 
 See Bagley,
 
 473 U.S. at 675, 105 S.Ct. at 3379-80. Evidence is material to the defense if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.
 
 Id.
 
 at 682, 105 S.Ct. at 3383-84 and 473 U.S. at 685, 105 S.Ct. at 3385;
 
 United States v. Kozinski,
 
 16 F.3d 795, 818 (7th Cir.1994). A “reasonable probability” is that sufficient to undermine confidence in the outcome.
 
 Id.
 
 The materiality standard is not met by “[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial....”
 
 United States v. Agurs,
 
 427 U.S. 97, 109-10, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976).
 

 The Supreme Court has held that an individual prosecutor “has a duty to learn of any favorable evidence known to the others acting on the government’s behalf in the case, including the police.”
 
 Kyles v. Whitley,
 
 514 U.S. 419,—, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995). The prosecutor cannot get around
 
 Brady
 
 by keeping herself in ignorance.
 
 Carey v. Duckworth,
 
 738 F.2d 875, 878 (7th Cir.1984).
 
 Brady,
 
 however, does not require a prosecutor to provide evidence that she could not reasonably have had knowledge of or control over.
 
 See United States v. Moore,
 
 25 F.3d 563, 569 (7th Cir.),
 
 cert. denied,
 
 — U.S.—, 115 S.Ct. 341, 130 L.Ed.2d 297 (1994). It does not require the prosecutor to divulge every possible shred of evidence that could conceivably benefit the defendant.
 
 Smith v. Secretary of New Mex. Dept. of Corrections,
 
 50 F.3d 801, 823 (10th Cir.),
 
 cert. denied,
 
 — U.S. —, 116 S.Ct. 272, 133 L.Ed.2d 193 (1995).
 
 [5]
 

 Hamilton first argues that the trial judge should have held an evidentiary hearing to. determine whether the Painter description given to police was irretrievably lost. The only evidence provided to the court regarding locating the document was the government counsel’s statement that the police told him they could not find the document in their files. According to Hamilton, that statement was insufficient to establish that the document was gone; the judge should have inquired further.
 

 Hamilton had plenty of opportunity before this appeal to find out if the document was actually lost. He failed, however, to request such a hearing at trial when it would have been most helpful. He did not object to the government’s offer of proof that no copy of the description could be located; the uncon-tradicted statements made by the government’s attorney near the end of trial indicated the document was lost. Hamilton has provided no newly discovered evidence contradicting the conclusion that the document is gone. Based on these failures we will not require any hearing on the matter. Because Hamilton himself did not object or suggest further investigation, we will not require the trial judge to have done so
 
 sua sponte.
 

 Next, Hamilton argues that the government’s
 
 Brady
 
 obligations include the duty to search its sources for exculpatory information and turn that information over to the
 
 *-1074
 
 defense. The government will not be found to have suppressed information if that information was available to the defense through the exercise of reasonable diligence.
 
 United States v. Morris,
 
 80 F.3d 1151, 1170 (7th Cir.),
 
 cert. denied,
 
 — U.S.—, 117 S.Ct. 181, 136 L.Ed.2d 120 (1996). Here, as the district judge pointed out, Hamilton hired an investigator who interviewed Painter and could have questioned him about previous descriptions.
 

 Hamilton’s argument, moreover, presupposes that Painter’s written description is exculpatory evidence, an assertion that is at best uncertain. Painter, who following his training had noted specific characteristics of the bank robber, gave authorities two other descriptions of the bank robber prior to trial. Hamilton was provided with these two reports of interviews with Painter, one by the Milwaukee police and one by the FBI. Each of these statements apparently was consistent, was close in time to the robbery, and provided Hamilton with a chance at trial to test Painter’s memory. Three days after the robbery he identified Hamilton in a lineup, which was far more damaging to Hamilton than any physical description given by Painter to police. On the back of the lineup card, Painter indicated the characteristics that matched between Hamilton and the bank robber and stated that he was sure Hamilton was the culprit. At trial, without relying upon any reference to prior written descriptions, Painter was absolutely certain Hamilton was the bank robber. According to Judge Stadtmueller, Painter “made about as unequivocal [an] identification of Mr. Hamilton as this court has ever seen both as a judge and formerly as a prosecutor.” After the existence of the missing description was elicited, Hamilton’s counsel could have questioned Painter further about what the missing description contained, yet he failed to do so. Trial, not appeal, was the proper place for such questioning and conjectures by counsel. Again, a
 
 Brady
 
 violation does not arise due to nothing more than a possibility that the undisclosed item might have helped the defense,
 
 Agurs,
 
 427 U.S. at 109-10, 96 S.Ct. at 2400-01, and that’s all Hamilton has shown.
 

 In addition, assuming
 
 arguendo
 
 that the statement would have been exculpatory by impeaching Painter with a prior inconsistent statement, Hamilton cannot prove the lost Painter description to be otherwise material. Painter’s testimony was not the only evidence. The jurors viewed the security camera videotape of the bank robbery and could form their own conclusions about the similarities of the robber to Hamilton. A cellmate testified that Hamilton confessed to him regarding robbing a bank in the Grand Avenue Mall, noting specifically that Hamilton used the stolen money to buy a leather outfit. Later testimony indicated that when Hamilton was arrested he just happened to be wearing a seemingly new leather outfit. An investigator on the case testified that Hamilton’s alibi changed twice. Based on these other facts, we do not believe that had the prior description been disclosed to the defense, the result of the proceeding would have been any different. Confidence in the outcome has not been undermined. Hamilton thus fails to convince us that the description is material, and no
 
 Brady
 
 violation has occurred.
 

 The judgment of the district court is AFFIRMED.
 

 [1]
 

 . Dr. Frederick stated that "[m]alingering refers to the intentional production of psychotic symptoms or the suppression of true cognitive or memory ability for some sort of secondary gain...." Examples of secondary gain include such things as avoiding prosecution, receiving a shorter sentence, getting moved from a correctional institution to a medical facility having better conditions, or gaining admittance to a mental health facility simply to obtain, as Dr. Crowley put it, “three hots and a cot."
 

 [2]
 

 . Curiously, Dr. Frederick had already testified, with everyone's consent, by telephone earlier in the hearing.
 

 [3]
 

 . We have indicated that before a judge issues a writ of habeas corpus ad testificandum to secure the appearance of a prisoner to testify at a sentencing hearing, other alternatives such as testimony by telephone should be pursued.
 
 United States v. Garrard,
 
 83 F.3d 889, 893 (7th Cir. 1996). Unlike competency hearings, though, the right of confrontation and strict rules of evidence do not apply to sentencing proceedings.
 
 See Lindh v. Murphy,
 
 96 F.3d 856, 870 (7th Cir. 1996),
 
 cert. granted on other grounds,
 
 - U.S. -, 117 S.Ct. 726, 136 L.Ed.2d 643 (1997) (no Confrontation Clause right at sentencing), and Fed.R.Evid. 1101(b) and (d)(3) (rules of evidence do not apply to sentencings).
 

 [4]
 

 . An interesting thing to note about Baker is that he really was not denied his right of confrontation, since the only witness was at the same location as he was; instead, Baker himself was only denied the right to appear personally before the judge.
 

 [5]
 

 . Fed.R.Crim.P. 16(a)(1)(C), meanwhile, requires the government to provide a defendant with all evidence “within the possession, custody or control of the government, and which [is] material to the preparation of the defendant’s defense or [is] intended for use by the government as evidence in chief at the trial...." Unlike
 
 Brady,
 
 however, Rule 16(a)(1)(C) imposes upon the federal government no duty to obtain documents that are controlled by the state government or police, even if the prosecution is aware of the items.
 
 United States v. Gatto,
 
 763 F.2d 1040, 1048-49 (9th Cir.1985);
 
 see United States v. Pinto,
 
 905 F.2d 47, 50 (4th Cir.1990). Thus, even though Hamilton mentions both
 
 Brady
 
 and Rule 16 in his brief, his appeal regarding Painter's statement really falls under the law of
 
 Brady
 
 and its progeny.