# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 01-4271

REGINALD MAHAFFEY,

*Petitioner-Appellant,*

*v.*

JAMES SCHOMIG,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 3677—**James F. Holderman**, *Judge.*

ARGUED APRIL 24, 2002—DECIDED JUNE 27, 2002

Before FLAUM, *Chief Judge*, and POSNER and EVANS, *Circuit Judges*.

EVANS, *Circuit Judge.* In this double homicide case, which started during the first term of the Reagan administration, two separate juries found Reginald Mahaffey guilty. After the convictions, two separate sentencing hearings ended in jury findings that Mahaffey was eligible for the death penalty and that no mitigating circumstances sufficient to preclude the imposition of the ultimate penalty were present. And so, Mahaffey received a sentence of death. Twice.

In July of 2001, after 18 years of litigation in state court, and the exhaustion of all remedies there, the case moved to federal court with Mahaffey's filing of a petition for a writ of habeas corpus. Later in 2001, the United States District

Court for the Northern District of Illinois denied the petition, a decision we review today on Mahaffey's appeal.

Mahaffey was convicted after his second state trial in 1991 of the murders of Dean and Jo Ellen Pueschel, the attempted murder of their young son Ricky, the rape of Jo Ellen, home invasion, armed robbery, aggravated battery to a child, residential burglary, and theft. In addition to the death penalty, several prison terms on the noncapital charges were also imposed. We start our review with some, but by no means all, of the facts.

On a hot August night in 1983, 11-year-old Ricky Pueschel was sleeping in the bedroom of his Northside Chicago apartment when he was awakened by a stranger holding him in a headlock. He tried to scream, but a hand was over his nose and mouth. Two voices told him to be quiet. Ricky blacked out. After regaining consciousness he went to the kitchen where he saw a man holding his mother and another man coming through the back door. The men ordered Ricky and his mother to lie on their stomachs on the dining room floor. One of the men then began striking Ricky's mother with an object. She was crying, and she told Ricky to listen to the men and to do as they said.

The next thing Ricky knew, he woke up in his bed in a puddle of blood. He went to his parents' bedroom, where he found his father sprawled out against one of the walls with blood nearby. In the dining room he found his mother lying on the floor with her head in a pool of blood. She had no heartbeat. The phone was ringing, but Ricky could not answer it because someone had ripped off the receiver cord. He went outside, where he encountered his grandfather, Joseph Heinrich, who had come over because he was expecting Jo Ellen to bring Ricky to his house that morning. When she failed to arrive, Heinrich phoned the Pueschels' residence but got no answer. He then went over to the Pueschels' residence, where he found Ricky walking around outside. He was covered with blood. Ricky told him that his parents were dead.

Paramedics arrived and took Ricky to the hospital, where he remained for a week. His left eye was swollen shut, and he had a fractured skull, multiple stab wounds to the back, and a life-threatening brain hemorrhage. When police arrived at the Pueschels' apartment they discovered two of Ricky's baseball bats covered with blood. They also found an empty gun holster and an empty gun rack near Dean's body.

A few days after these horrific crimes, Cedric Mahaffey told police that two of his brothers, Reginald and Jerry, were involved in the Pueschel break-in. After questioning Cedric, the officers went to the apartment where Reginald Mahaffey was staying. Morriell Redmond, who was leasing the apartment from his grandmother and renting a room in it to Mahaffey, answered the door. The officers asked if Mahaffey was in the apartment. After Redmond gave permission to search the apartment, Mahaffey was discovered lying on the floor in one of the bedrooms. He was arrested. And one of the first things he said was that he knew the police were "coming after" him and that he was "going to get caught." He went on to provide details of the events that occurred in the Pueschel residence a few days earlier.

The police searched the Redmond-Mahaffey apartment and found 24 pieces of jewelry, all later identified as belonging to either Dean, Jo Ellen, or Ricky Pueschel. Police also recovered bullets and shotgun shells matching guns stolen from the Pueschels' apartment. Mahaffey told the police that they had recovered most of what he and his brother Jerry had taken, although Jerry still had the Pueschels' VCR, Atari game, and some videocassettes.

Mahaffey and the officers then went to the home of Roosevelt Mahaffey (the record does not tell us his relationship to Reginald, but it seems likely he is another brother), who signed a consent-to-search form. The officers

found a rifle and a portable television that belonged to the Pueschels. The officers then went to Jerry Mahaffey's apartment and arrested him. During a search of his apartment they recovered a video recorder, electronic TV games, an Atari game, and some videocassettes belonging to the Pueschels, including a video of their wedding.

The officers took Reginald Mahaffey to the police station, where all the recovered proceeds were placed on a table. Mahaffey removed a white metal ring with a blue stone in the center from his left hand. From his pants pocket he removed a man's Seiko watch and a gold chain with a crucifix on it. These items were all taken from the Pueschel apartment.

An assistant state's attorney, Irving Miller, met with Mahaffey at the police station. He advised Mahaffey of his *Miranda* rights, and Mahaffey confessed again. He admitted that he raped Jo Ellen. He also stated that he had no complaints about the way the police had treated him. In fact, Miller said Mahaffey told him the police treated him "very fine." After being advised of his rights a second time, Mahaffey gave a 23-page statement detailing the break-in at the Pueschel residence. After reviewing the written statement, he initialed and signed it.

In the formal statement, Mahaffey said he and his brother Jerry had planned to burglarize a clothing store on the north side of Chicago but that their van broke down on the way. While walking away from the van, they noticed that one of the apartments in a nearby building had an open window. Reginald said they removed the screen and entered the apartment. Before exploring the rest of the apartment, the Mahaffeys drank some Kool-Aid from the refrigerator and took some money, about $11, from a wallet that was sitting on the kitchen table. Reginald then picked up a butcher knife and the brothers entered Ricky's room.

Reginald put a pillow over Ricky's head, telling him not to make any noise. Reginald then began choking Ricky

while Jerry held his mouth. Ricky struggled and tried to call for help. Reginald directed Jerry to stab the boy, which he did. Then Reginald discovered a basket of bats in Ricky's room, and Jerry used one of them to hit Ricky.

Reginald picked up another bat, and he and Jerry went into Dean and Jo Ellen's bedroom, where they stood on either side of the bed. Simultaneously, they began hitting Dean in the head with the bats. Jo Ellen awoke while Jerry was still beating Dean, and Reginald told her to be quiet and that she would be all right. Reginald then took her into the kitchen where he began to rape her, finishing the act over the arm of a couch in the living room. While Reginald was raping Jo Ellen, Jerry came out of the bedroom with Dean's .357 magnum. According to Reginald, Jerry then addressed Jo Ellen, saying, "Listen, bitch, somebody told us you got a lot of pistols," and he demanded to know where they were.

After Jo Ellen was raped, Reginald returned to the bedroom where Dean was lying on the floor. He took some jewelry and a T-shirt. He then returned to the living room where he said Jerry "was having sex with her [Jo Ellen] in the mouth." Reginald told her that everything would be all right if she cooperated. Jo Ellen told Reginald that Jerry was being "rough with her" and Reginald said, "Just go along because [you] really ain't got no choice."

Reginald then asked Jo Ellen where she kept her car keys. She handed over the keys and warned him that the car was alarmed. She then put on a trench coat, went outside, and deactivated the alarm. Reginald packed the TV, tape player, arcade game, and some tapes and put them in a box with some jewelry, a rifle, a shotgun, and the .357 magnum. The Mahaffeys also took several boxes of shotgun shells and bullets.

Reginald loaded the stolen goods into the car, then returned to the apartment, where he hit Jo Ellen in the head

with the .357. He told her to lie down. He then hit her in the head a few more times with the pistol while Ricky was lying on the ground next to her. As he was leaving the house, he again told Jo Ellen that she was going to be all right. Jerry then told Reginald that they had to "kill this bitch, too." Reginald said, "I know man. Don't make her panic." As Reginald was leaving, he heard "solid hits," which told him that Jerry was "finishing the lady and her son off with the bats . . . ." Reginald also told Jerry to stab the "little boy."

After the crimes, the Mahaffeys left and drove to 3534 West 13th Place, where Reginald was staying. They carried the stolen goods into his apartment. To get rid of the car, they drove it to the housing projects on West Lake Street and left it in a back parking lot, hoping that someone would steal it so that any fingerprints left behind would be "no good." Then they took a bus back to 13th Place. A few days later, Reginald and Jerry moved some of the stolen goods to their brother's house, then divided up the remaining goods. During questioning, the assistant state's attorney showed Reginald a photo of Jo Ellen, Dean, and Ricky, and Reginald stated, "Those are my victims."

During his hospital stay, Ricky was transported by ambulance to a police station to view a lineup, although, according to his doctor, the boy had not recovered from his head injury "by any means." At the lineup Ricky was unable to identify Mahaffey. At the trial, however, Ricky had recovered from the head injury. In his testimony, he said he was "99 percent sure" that Reginald Mahaffey was one of his parents' murderers.

Pam Fish, a forensic scientist in the serology unit of the Chicago Police Department crime lab, ran tests on the bloody bats, blood taken from the victims' bodies, and a vaginal swab taken from Jo Ellen. One of the bats was covered with Jo Ellen's blood type and the other was cov-

ered with Dean's. The vaginal swab tested positive for the presence of sperm. Mahaffey is a nonsecretor, which means that his semen does not secrete his blood type. Fish could not determine the blood type from the vaginal swab because it did not reveal the presence of activity for any blood type.

At his first trial in 1984, where Reginald and Jerry were joined as codefendants, Mahaffey's counsel moved to suppress the physical evidence obtained in the searches and the many incriminating statements given by Mahaffey, contending that the police failed to give *Miranda* warnings and beat him at his apartment and later at the police station. At a hearing on the motions, several officers testified that they read Mahaffey his *Miranda* warnings and that he was not beaten into confessing. Miller, the assistant state's attorney who took Mahaffey's formal confession, said that he didn't see anyone hit Mahaffey and that he observed no physical evidence of a beating. Miller also testified that Mahaffey told him that he was not mistreated while in police custody. The motions to suppress were denied and Mahaffey was convicted of various charges arising from the break-in. As we said, he was sentenced to death. Ditto for Jerry.

Mahaffey was granted a new trial based on his claim that he should not have been tried jointly with his brother. *People v. Mahaffey*, 128 Ill. 2d 388, 539 N.E.2d 1172 (1989). Both Jerry and Reginald gave confessions that were admitted into evidence. Because Reginald testified (and thus was subject to cross-examination), and Jerry did not, only Reginald received a second trial. Jerry, however, did get lucky in federal court where, on his petition for a writ of habeas corpus, a split panel of this court found that he made out a prima facie showing of a violation of the rule in *Batson v. Kentucky*, 476 U.S. 79 (1986). *See Mahaffey v. Page*, 162 F.3d 481 (7th Cir. 1998). That result was quite unusual because the court, by a 2-1 vote (Judges Flaum

and Cummings in the majority and Judge Rovner dissenting), initially denied relief. See our vacated opinion, *Mahaffey v. Page*, 151 F.3d 671 (1998). That result changed when the late Judge Cummings switched sides and joined Judge Rovner on rehearing. That course of events drew a dissent from Judge (now Chief Judge) Flaum.

Reginald Mahaffey moved to represent himself at his second state trial, and the court found, after extensive admonishments and questioning, that he knowingly waived his right to counsel. Although Mahaffey's wish to represent himself was honored, the judge directed that an assistant public defender sit with Mahaffey as a "legal advisor" during the trial. The trial proceeded, Mahaffey did not renew the motions to suppress evidence and statements, and the second trial ended with another conviction. The judge again advised Mahaffey of his right to counsel at the sentencing hearing, which Mahaffey again waived. Whereupon, the public defender "advisor" requested a competency exam, which the judge granted over the state's objections. The examination, performed by Dr. Robert Reifman, the head of the Cook County Psychiatric Institute, resulted in a finding that Mahaffey was fit to proceed.

Dr. Reifman testified again during the penalty hearing, stating that Mahaffey had a mixed personality disorder, was antisocial, narcissistic, passive-aggressive, immature, and impulsive, but not psychotic or suffering from a mental disease. The prosecution then presented several witnesses in aggravation who testified to Mahaffey's prior criminal acts, including a robbery and two burglaries. It also presented evidence regarding Mahaffey's unsuccessful attempt to escape from the Cook County Department of Corrections. Mahaffey presented no evidence in mitigation. The jury found that there were no mitigating circumstances sufficient to preclude a sentence of death, and that was part of the penalty ultimately imposed. Mahaffey's direct appeal from his second conviction was

rejected by the Supreme Court of Illinois. *People v. Mahaffey*, 166 Ill. 2d 1, 651 N.E.2d 1055 (1995). Five years later, the highest court of Illinois rejected a petition for collateral relief under the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1 *et seq. People v. Mahaffey*, 194 Ill. 2d 154, 742 N.E.2d 251 (2000). The Supreme Court of Illinois held that almost all the issues raised on the collateral review were procedurally defaulted because they were not presented on the earlier direct appeal and that they were unpersuasive, in any event, if considered on the merits. As we said, the federal district court then denied Mahaffey's petition for federal habeas relief, which brings us to today.

A federal court may grant a writ of habeas corpus to a prisoner held under a state court judgment only if his custody violates the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). We review *de novo* the state court's legal determinations, as well as mixed questions of law and fact. *See Hall v. Washington*, 106 F.3d 742, 758 (7th Cir. 1997). Errors of state law are irrelevant unless they resulted in the deprivation of a constitutional or federal right. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Gonzalez v. DeTella*, 127 F.3d 619, 621 (7th Cir. 1997).

Before a federal court will consider a habeas petition, a petitioner must satisfy several procedural requirements. First, a petitioner must exhaust state remedies—that is, give the state's highest court an opportunity to address each claim. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 839 (1999); *Wilson v. Briley*, 243 F.3d 325, 327 (7th Cir. 2001). To satisfy this requirement, a petitioner must present to the state judiciary both the operative facts and legal principles that control each claim. *See Wilson*, 243 F.3d at 327. Second, the petitioner must comply with state rules to avoid procedurally defaulting his claims. *See Boerckel v. O'Sullivan*, 135 F.3d 1194, 1196-97 (7th Cir. 1998), *rev'd on other*

*grounds by O'Sullivan v. Boerckel*, 526 U.S. 838, 849 (1999). A federal court, however, may excuse a procedural default if a petitioner can show either cause for the default and prejudice arising from failure to review the claims, or that failure to review the claims on procedural grounds would result in a fundamental miscarriage of justice. *See Howard v. O'Sullivan*, 185 F.3d 721, 726 (7th Cir. 1999).

If a petitioner passes all these hurdles, a federal court may then grant a writ of habeas corpus, but only if the state court's rejection of the claim either resulted in a decision that was contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). The state court's factual determinations are presumed correct, although a petitioner may rebut that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

In support of his habeas petition, Mahaffey raises a cluster of claims based on events that took place within the Chicago Police Department in the 1980's, around the time he was arrested. The officers who arrested and questioned Mahaffey were part of "Area 2" of the Chicago Police Department, which became the subject of internal reports and lawsuits centering on claims by defendants in criminal cases that some of its officers abused them to extract confessions. This alleged abuse is the prism through which Mahaffey attempts to pass three separate habeas claims: a *Brady* claim, an ineffective assistance of counsel claim, and a Fourth Amendment claim. Basically, Mahaffey argues that if he had known of the claims against Area 2 officers before his suppression hearing and trials, he could have used the evidence to show that officers tortured him into confessing and generally to impeach their testimony. To show that "evidence" of widespread abuse used to extract

confessions existed at the time of his 1984 suppression hearing and trials, Mahaffey cited the state court transcript of a 1982 suppression hearing involving a defendant named Andrew Wilson, who alleged that Area 2 officers tortured him into confessing to an explosive crime—the murder of two Chicago police officers. *See People v. Wilson*, 506 N.E.2d 571 (1987). He also cited evidence, gathered beginning in the late 1980's, alleging that some Area 2 officers routinely beat and tortured suspects to obtain confessions. Against this background, we consider Mahaffey's claims.

*Brady v. Maryland*, 373 U.S. 83, 87 (1963), holds that the prosecution's suppression of evidence favorable to an accused violates due process when it is material to guilt or punishment. Mahaffey claims that the state violated *Brady* when, during the 1984 hearing on his motion to suppress his statements, the state failed to disclose exculpatory evidence—the abuse allegations against certain Area 2 officers. This claim was first made in 1997, 16 years after the murders, 15 years after the first trial, 10 years after the first appeal, 6 years after the second trial, and 2 years after Mahaffey's direct appeal was rebuffed by the Illinois Supreme Court. The district court declined to consider Mahaffey's *Brady* claim, holding that the Illinois Supreme Court's determination that Mahaffey waived it by failing to raise it on his 1995 direct appeal was an independent and adequate state ground disposing of the claim. *See People v. Mahaffey*, 194 Ill. 2d 154, 173 (2000).

Illinois law provides that the failure to raise an issue on direct appeal results in it being barred by *res judicata* in postconviction proceedings. *See People v. Whitehead*, 169 Ill.2d 355, 371 (1996), *partial overruling on other grounds recognized by People v. Page*, 193 Ill.2d 120 (2000). Illinois law also provides that a court may review an improperly preserved postconviction claim where fundamental fairness so requires, which means that the petitioner must demonstrate cause and prejudice. *See id.* at 371-72. The

Illinois Supreme Court held that Mahaffey could not show cause and prejudice because he failed to establish that the information submitted in support of his *Brady* claim was available to the state at the time of the 1984 suppression hearing or that there was an "investigation" of Area 2 officers before that time. The court also held that Mahaffey failed to produce evidence that the state knew in 1984 of a series of prior instances in which Area 2 officers allegedly tortured suspects to extract confessions and that any apparent nexus between alleged abuse of other suspects and Mahaffey's claims of abuse did not arise until years after his suppression motion. Thus, the court found that Mahaffey could not state a *Brady* claim and therefore that he suffered no prejudice.

Mahaffey argues that, in light of Andrew Wilson's 1982 allegations that Area 2 officers tortured him, the Illinois Supreme Court clearly erred in holding that evidence of the Area 2 officers' alleged brutality did not exist at the time of Mahaffey's suppression hearing. The record indicates that Mahaffey provided the Wilson transcript to the Illinois Supreme Court on postconviction review. Although the Wilson transcript details allegations of torture, Mahaffey presented no evidence that the state was or should have been aware at the time of Mahaffey's suppression hearing that Wilson's alleged mistreatment was part of a larger system of abuse. Even assuming the truth of Wilson's testimony, the other exhibits Mahaffey produced in support of his *Brady* claim indicate that information suggesting that Area 2 officers systematically abused suspects did not arise until the late 1980's or early 1990's, well after Mahaffey's 1984 suppression hearing.

The 1984 suppression hearing consisted of Mahaffey's testimony that police officers beat him after arresting him in Redmond's apartment and later at the police station. Mahaffey also presented Redmond's testimony that, although he saw no abuse in the apartment during the arrest,

he heard Mahaffey holler "Don't hit me no more." The state trial judge found Mahaffey's and Redmond's testimony unworthy of belief. Weighed against this discredited testimony, the state presented the testimony of several arresting officers that no abuse occurred; testimony from state's attorney Miller that Mahaffey showed no signs of abuse and made no claims of abuse during the whole time that Miller and Mahaffey were together while Mahaffey was making his detailed statement, which itself said no abuse occurred; and the testimony of a medical technician at the Cook County jail, who observed no signs of abuse (or heard complaints of abuse) when Mahaffey was booked after admitting his crimes to the police and Miller.

Even assuming that Mahaffey did not procedurally default his *Brady* claim or that he could overcome his default by establishing cause and prejudice, his claim would be unsuccessful. A *Brady* violation does not arise due to nothing more than the possibility that the undisclosed evidence might have helped the defense. *See United States v. Hamilton*, 107 F.3d 499, 510 (7th Cir. 1997). As we have said, to establish a valid *Brady* claim, a petitioner must show that the prosecution suppressed the evidence, that the evidence was favorable to the defense, and that the evidence was material to the case. *See United States v. Asher*, 178 F.3d 486, 496 (7th Cir. 1999). The test for materiality is whether, in the absence of the evidence, the petitioner received a fair trial resulting in a verdict (or in this case a suppression hearing and a decision) worthy of confidence. *See id.* (citing *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

Here, Mahaffey argues that evidence of systematic police brutality would have helped him establish that the police abused him to extract a confession. This argument is undermined by the fact that Mahaffey put forth no credible evidence that he suffered physical injuries from a beating. Moreover, Mahaffey stated in his detailed confession that the officers treated him well, gave him food and coffee

during questioning, and did not beat him. Also, the Illinois courts found that the only officer to have custody of Mahaffey at Area 2 was Detective John Yucaitis, and he was not directly implicated in any abuse allegation (though he was present during Wilson's statement) by other arrestees.

Even disregarding Mahaffey's confession, the state presented powerful evidence at trial of his guilt. Ricky Pueschel identified him in court as his parents' murderer. Mahaffey argues that Ricky's identification was unreliable because he expressed "uncertainty" (i.e., he was "only" 99 percent certain of his identification) and because he failed to pick Mahaffey out of a pretrial lineup. This argument is unavailing because, as we said, the lineup took place while Ricky was still recovering from severe head injuries, which explains his failure to identify Mahaffey at that time. In addition to young Ricky's identification, the jury heard that police found the Pueschels' jewelry and weapons in Mahaffey's living quarters when they arrested him. They also heard that, at the police station after his arrest, Mahaffey produced a ring and a wristwatch belonging to Dean Pueschel and stated that they belonged with the other stolen property that the police had recovered. Thus, even in the absence of Mahaffey's confession, enough evidence linking him to the crime existed to ensure that the verdict of guilty against him was worthy of confidence. Therefore, even had Mahaffey properly preserved his *Brady* claim, it would not support a grant of habeas relief.

Mahaffey's second Area 2 claim is that he received ineffective assistance of counsel at his suppression hearing and first trial because his counsel did not investigate and discover the alleged Area 2 misconduct. The district court held that Mahaffey waived this argument by failing to raise it on his direct appeal before the state court system and failed to show cause and prejudice for the default.

We agree with the district court. As we have noted, no evidence establishing a pattern of brutality existed in 1984,

so Mahaffey's counsel had nothing to discover. Although Wilson's 1982 testimony existed, it would not have alerted counsel to the possibility of Area-2-wide brutality used to extract confessions. Thus, Mahaffey cannot establish prejudice to overcome his procedural default.

Even assuming that Mahaffey properly preserved his ineffective assistance claim, it would be unsuccessful. To establish a claim of ineffective assistance of counsel, Mahaffey must show that his 1984 counsel's performance was deficient, which means that counsel's errors were so serious that they deprived Mahaffey of "counsel" within the meaning of the Sixth Amendment, and that the deficient performance prejudiced him, which means that counsel's errors were so serious that they deprived him of a fair trial with reliable results. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Here, there was no deficient performance, because evidence of systematic abuse leading to coerced confessions didn't exist in 1984. Assuming deficient performance, Mahaffey cannot satisfy the prejudice prong of the *Strickland* test because, even ignoring his confession, overwhelming evidence supported his conviction. Therefore, Mahaffey's ineffective assistance claim could not support a grant of habeas relief.

Mahaffey's final "Area 2" issue is a Fourth Amendment claim that rests on shifting sand. In his brief he says he was victimized by an illegal arrest and search. He says the police should have had a warrant to enter the apartment where he was living and that his "landlord [Redmond] had no authority to validly consent to the warrantless entry by police into Petitioner's domain." He goes on to argue, "Because of the sublease arrangement between Petitioner and his landlord, the latter did not have 'common authority' or 'mutual use' concerning the bedroom so as to provide effective consent for the entry to arrest and search." The Su-

preme Court of Illinois found a valid consent by Redmond to the entry and search and further that exigent circumstances excused the failure to get a formal warrant.

Mahaffey cannot pursue his Fourth Amendment claim in federal court under *Stone v. Powell*, 428 U.S. 465 (1976), if he had a full and fair consideration of the claim in state court. So now, rather than focus on Redmond's alleged lack of legal authority to consent to the entry and search, Mahaffey shifts gears and, pulling out the "Area 2" issue, says he didn't receive "a full and fair" Fourth Amendment hearing because he could not impeach the officers with the alleged "beating" evidence. The officers' testimony at the 1984 suppression hearing was the basis for the court's finding that the warrantless search and arrest were justified by consent and exigent circumstances. At that time, we repeat, the only evidence of alleged Area 2 abuse was Wilson's suppression hearing transcript. Because Wilson's testimony was not very strong evidence of systematic police misconduct, it would not have impeached the officers' testimony that Redmond consented to the officers' entry into, and search of, the apartment where Mahaffey was arrested.

Nor would the Area 2 evidence have strongly impeached the officers regarding the existence of exigent circumstances. There was a danger that Mahaffey would flee if not quickly apprehended because his brother Cedric was directing the officers to Mahaffey's apartment when the police car passed yet another Mahaffey brother, Terry. Cedric put a towel over his face, telling the officers that he feared that Terry would warn Mahaffey that Cedric was with the police. The officers believed that Mahaffey was armed because Cedric had told them that Mahaffey had two of the three guns taken during the Pueschel break-in. And time was of the essence here. The officers did not speak to Cedric until 2 a.m. on September 2, 1983. Immediately after speaking to him, they drove to the apartment where Mahaffey

was staying, arriving there at about 4:15 a.m. Thus, the strength of the exigent circumstances evidence surely would have outweighed any impeachment evidence regarding the alleged misconduct of Area 2 officers in other cases. Therefore, Mahaffey had a full and fair opportunity to litigate his Fourth Amendment claims before the state court, and his Fourth Amendment claim cannot form the basis for habeas relief under *Stone v. Powell*.

Mahaffey also raises several issues that do not rely on the Area 2 claims. The first is that forensic expert Fish gave perjured testimony at both trials. Mahaffey never raised this argument before the state court and therefore procedurally defaulted it. To overcome the default, he must demonstrate cause and prejudice.

Here, Mahaffey argues that cause existed for his default because his evidence of Fish's alleged perjury was newly discovered. He cites a 2001 review of Fish's testimony in several other cases by criminalists at Forensic Science Associates, a California laboratory. In their review, the criminalists stated that Fish frequently exaggerated the scientific significance of her findings in favor of the prosecution.

Even assuming that this report constituted newly discovered evidence, Mahaffey cannot establish prejudice arising from his default of this claim. Fish testified that a revolver recovered from Mahaffey's night stand had blood traces consistent with Jo Ellen's blood type and that a vaginal swab tested positive for the presence of sperm. She also testified that Mahaffey was a nonsecretor and that she could not determine the blood type from the vaginal swab because it did not reveal the presence of activity for any blood type. Even excluding this testimony, sufficient evidence, in the form of Ricky's identification and the stolen property recovered from Mahaffey's residence and person, existed to support Mahaffey's conviction. Therefore, because

he cannot establish cause and prejudice, Mahaffey procedurally defaulted his claim that Fish presented perjured testimony.

Mahaffey's next claim is that he was sentenced in violation of his Fifth Amendment right against self-incrimination. In support of this claim, he argues that Dr. Reifman should have been precluded from testifying at the sentencing hearing because Mahaffey was not given a *Miranda* warning before the psychiatric examination. The Illinois Supreme Court held that Mahaffey failed to preserve this issue because he did not make a contemporaneous objection to Reifman's testimony at the sentencing hearing. Thus, the Supreme Court's review of the issue was for plain error. *See People v. Bean*, 137 Ill. 2d 65, 80 (1990). The plain-error exception applies where the evidence is closely balanced or when the error is so substantial that it denied the petitioner a fair proceeding. *See id.*

The Illinois Supreme Court held that plain error did not exist. Mahaffey did not present any evidence in mitigation, whereas the state presented extensive evidence in aggravation, including Mahaffey's prior criminal record and his attempt to escape from the Cook County Department of Corrections. Therefore, the Illinois Supreme Court declined to review Mahaffey's Fifth Amendment claim.

Mahaffey argues that the state court's ruling unreasonably misapplied the United States Supreme Court's holding in *Estelle v. Smith*, 451 U.S. 454 (1981). There, the Court held that the Fifth Amendment right against self-incrimination applies to certain uses of mental health examinations and interviews. *Estelle v. Smith* was a capital case in which the prosecutor used the defendant's statements made during a pretrial competency examination (which the trial court ordered *sua sponte*) to show the defendant's future dangerousness, an element required to impose the death penalty in Texas. *See id.* at 456-60. In

contrast, Reifman merely testified that Mahaffey was fit for sentencing and that he was not suffering from a mental disease. Therefore, because Mahaffey's case is distinguishable, the Illinois Supreme Court did not unreasonably apply *Estelle v. Smith*. We find that the Illinois Supreme Court's holding was an independent and adequate state basis for disposition of the claim. Mahaffey has not demonstrated cause for his failure to make a contemporaneous objection to Reifman's testimony. Nor can he demonstrate prejudice because, even excluding Reifman's testimony, the state presented adequate evidence in aggravation to support Mahaffey's death sentence.

Mahaffey also argues that his Eighth Amendment rights were violated when the prosecutor made a reference to the Bible during rebuttal at the second stage of the sentencing hearing. Mahaffey failed to make a contemporaneous objection to the comment, and the Illinois Supreme Court again held that the argument was waived. It also found that the plain-error exception did not apply because the sentencing evidence was not closely balanced.

We find that the Illinois Supreme Court's disposition of this claim rested on an independent and adequate state ground. Mahaffey has not demonstrated cause for his failure to make a contemporaneous objection to the comment. Nor can he demonstrate prejudice. Because Mahaffey presented no mitigating evidence to counter the state's extensive aggravating evidence, he suffered no prejudice from the prosecutor's biblical reference. Additionally, the jurors were properly advised of the nature and purpose of the parties' arguments and would have understood that the prosecutor's comment was not to be considered as evidence.[1]

----

[1] We note that Mahaffey's own argument was replete with references to God and the Bible. In fact, he began his closing argu-
(continued...)

Finally, Mahaffey argues that he is entitled to habeas relief because the jury returned legally inconsistent verdicts at the eligibility phase of his sentencing hearing. The state asserted that Mahaffey was eligible for the death penalty based on two aggravating factors—his commission of multiple murders and his commission of murder in the course of a felony. The multiple-murder verdict would have required the jury to find that Mahaffey had been convicted of murdering two or more persons and that the deaths were the result of an intent to kill more than one person or of separate acts that he knew would cause death or create a strong probability of death or great bodily harm to the victim or another. The felony-murder aggravating factor required the jury to find that Mahaffey acted with intent or knowledge in killing or injuring the murdered person. The jury returned a felony-murder verdict but not a multiple-murders verdict. Under Illinois law, verdicts returned in the same action that are legally inconsistent should be set aside, necessitating a new trial. *See Mercado v. Ahmed*, 974 F.2d 863, 866 (7th Cir. 1992).

The Illinois Supreme Court held that the verdicts were not inconsistent. It reasoned that the jury's failure to return a finding on the multiple-murder aggravating circumstance meant that it was unable to determine that Mahaffey acted with knowledge or intent with respect to both victims. The court went on to find that the jury could have found that Mahaffey possessed the requisite intent with regard to one of the victims but not for both, which would have allowed the jury to return a finding on the felony-murder factor but not on the multiple-murder factor.

---

[1]  (...continued)
ment by saying, "Ladies and gentleman, I'm here before you today in the name of the Lord." R. at 1718.

But even assuming that the verdicts were legally inconsistent, the Illinois Supreme Court's decision not to grant a new trial did not involve an unreasonable application of United States Supreme Court precedent. The United States Supreme Court has held that inconsistent verdicts are constitutionally tolerable. *See Los Angeles v. Heller*, 475 U.S. 796, 804 (1986); *Standefer v. United States*, 447 U.S. 10, 25 (1980). Thus, Mahaffey is not entitled to habeas relief on this ground.

AFFIRMED.

A true Copy:

      Teste:

                _____

                *Clerk of the United States Court of Appeals for the Seventh Circuit*