(No. 85215.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. REGINALD MAHAFFEY, Appellant.

*Opinion filed October 13, 2000.—Rehearing denied January 29, 2001.*

157

HARRISON, C.J., concurring in part and dissenting in part.

John E. Horn and H. Elizabeth Kelley, of Tinley Park, and the Office of the State Appellate Defender, of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers, Assistant Attorney General, of Chicago, and Renee Goldfarb, William Carroll and Judy L. DeAngelis, Assistant State's Attorneys, of counsel), for the People.

Jed Stone, of Chicago, for *amicus curiae* The Campaign to End the Death Penalty.

JUSTICE McMORROW delivered the opinion of the court:

Pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122—1 *et seq.* (West 1994)), defendant, Reginald Mahaffey, petitioned the circuit court of Cook County for

post-conviction relief. The trial court dismissed defendant's amended post-conviction petition without conducting an evidentiary hearing. Defendant also filed a motion to vacate his convictions and sentences pursuant to section 2—1401 of the Code of Civil Procedure (735 ILCS 5/2—1401 (West 1996)) alleging that new evidence, outside the record, supported defendant's previous assertions that his confession was a result of torture at the hands of Chicago police officers assigned to Area 2 police headquarters. The circuit court also dismissed this motion without an evidentiary hearing. Because defendant was sentenced to death for the underlying murder convictions, he appeals directly to this court. 134 Ill. 2d R. 651(a). For the reasons that follow, we affirm the judgment of the circuit court.

## BACKGROUND

This court has previously detailed the evidence presented at defendant's trial in our opinion on direct appeal. *People v. Mahaffey*, 166 Ill. 2d 1 (1995). Therefore, we state here only those facts which are necessary to the disposition of this appeal. On September 2, 1983, defendant and his brother, Jerry Mahaffey, were arrested by Chicago police officers for the August 29, 1983, murders of Dean and Jo Ellen Pueschel and the attempted murder of their 11-year-old son, Richard. On December 29, 1983, defense counsel filed a "motion to suppress statements," claiming that defendant's post-arrest statements and admissions to police were "the direct result of either physical or mental coercion."

Specifically, the motion alleged that at the time of defendant's arrest, several police officers assigned to Area 2, including Sergeant John Byrne and Detective John Yucaitis, induced defendant into making a statement by telling him that "his brother had already flipped on him, and if he didn't give a statement to the police, he would go to the electric chair alone" and lose any chance for le-

niency. In addition, the motion stated that the arresting officers "did beat the defendant, causing injuries to the defendant's ribs, and this beating was done to induce a statement."

A hearing on defendant's suppression motion was conducted in February 1984. The sole witness called by the State in its case in chief was Irving Miller. Miller testified that, in his then capacity as a felony review supervisor with the Cook County State's Attorney's office, he met with defendant at Area 2 police headquarters on the morning of September 2, 1983. According to Miller, he spoke to defendant in an interview room at approximately 9:30 a.m. and advised defendant of his *Miranda* rights. After defendant indicated that he understood his rights, defendant gave a statement implicating himself in the crimes which occurred at the Pueschels' apartment. Miller testified that this statement lasted approximately 20 minutes, and that Detective Yucaitis was also present in the room during the time defendant gave this statement. Miller then left the room, returned one-half hour later, and again spoke with defendant for a short time. According to Miller, Detective Yucaitis was present during this conversation as well. Miller testified that he next saw defendant at approximately 11:30 a.m. in a different, larger interview room at Area 2, at which time defendant agreed to give a court-reported statement with respect to his involvement in the crimes at the Pueschel home. Miller stated that he initially spoke alone with defendant for 15 minutes concerning the procedures for making a court-reported statement, and also informed defendant of the questions which Miller would ask defendant during the interview. Miller testified that he also inquired of defendant concerning his treatment by police, and that defendant made no statement to him that he was beaten or threatened. Miller testified that, at the conclusion of this brief meeting, Detective Yucaitis, As-

sistant State's Attorney George Velich, and a court reporter arrived at the interview room, and defendant gave his confession. Defendant signed this court-reported statement between 3 and 4 p.m. the same day. Miller testified that no one struck defendant in his presence, used mental coercion, or threatened defendant with the electric chair.

Defendant testified on his own behalf. He stated that he was arrested at his apartment at approximately 4:15 a.m. on the morning of September 2, 1983. Defendant stated that when the police arrived, he was lying on the floor of his bedroom. The officers instructed him to get up and he was taken into the kitchen, where he was asked his name. Defendant testified that when he responded, one of the officers kicked him in his groin. Defendant then fell to the floor and was kicked in his ribs and in the side of his head. Defendant stated that he was struck three times by the police in his apartment before he was taken outside. According to defendant, the beating was administered by two plainclothes officers, one whom defendant described as having curly dark-brown hair, who was heavier in weight than defendant, and who was between 5 feet 11 inches and 6 feet 2 inches in height. Defendant testified that he did not clearly see the second officer because when he was struck by the first officer, he fell facedown. However, defendant stated that the second officer was shorter than the officer with curly brown hair, and weighed somewhat over 200 pounds.

Defendant further testified that the officers tried to trip him as he was going up the stairs from his basement apartment to the sidewalk, and that the officers decided among themselves that defendant would be transported to Area 2 by the detective with curly brown hair who had beaten him in the apartment. Defendant testified that he was placed in the back seat of the car, and two detectives

sat in the front seats, with the curly brown-haired detective sitting on the passenger side. According to defendant, during the ride to Area 2, this detective turned around and struck him once in the forehead.

Upon his arrival at Area 2 police headquarters, defendant testified, he was placed in a small interview room, where he was handcuffed to a ring in the wall. Defendant stated that, while he was in that room, he was repeatedly hit by the same detective with curly brown hair who had beaten him at his apartment and struck him in the car. According to defendant, when the detective did not like defendant's reply to his questions, he would strike defendant in his midsection with a flashlight, and hit defendant in his back and across his shoulder blades. Defendant stated that a plastic bag was also placed over his head and that the same detective "started bumping the back of [defendant's] head against the concrete wall." According to defendant, the detective with the curly brown hair was the only officer who actually hit him at Area 2, although there were other officers in the interview room at various times.

Defendant testified that the only reason he made statements to the police was because he was in fear for his safety. Defendant stated that he was told by police that unless he confessed to the murders, he would die. According to defendant, the officers also told him what to say during his confession. Defendant stated that he informed Assistant State's Attorney Miller about the beatings during their first meeting, but that Miller left the room after telling defendant that he was only there to take defendant's statement. According to defendant, after Miller exited, the beatings began once again.

Defendant testified that he stated during his court-reported confession that he was not beaten by police because he wanted to avoid any further abuse. In addition, defendant testified that he was in fear for his safety

because the same detective with curly dark-brown hair who had previously beaten him was also present in the room, and that this same detective had previously told defendant that Miller, in his role as a State's Attorney, could not assure defendant's safety. According to defendant, after he gave his court-reported statement, Miller requested that defendant read it, and defendant replied that he was unable to read. Defendant testified that Miller read him portions of the statement and instructed defendant on how to correct misspellings in the text. Thereafter, according to defendant, Miller told defendant to initial and sign the statement. Defendant testified that the beatings ceased once he gave the court-reported statement.

Defendant further testified that after he gave his court-reported statement, a paramedic was called because he began vomiting. Defendant stated that he told the paramedic that he had a headache and pain in his ribs, but admitted that he did not tell the paramedic that he had been kicked in the head or in the ribs.

The next witness to testify on behalf of defendant was Morriell Redmond. He stated that he had rented defendant a room in his basement apartment and that he had opened the door to the police on September 2, 1983. He testified that he did not see the police hitting defendant because he was facing away from the kitchen area, but he heard defendant "hollering" and "screaming." He stated that defendant repeatedly said, "Don't hit me no more." However, Redmond admitted that he never informed anyone about what he overheard.

The State called several witnesses in rebuttal. Detective Charles Grunhard testified that he was one of several officers who went to defendant's apartment on the morning of September 2. Although Grunhard remained in the apartment's living-room area with Morriell Redmond, he testified that he observed Sergeant Byrne and

Detective Yucaitis immediately proceed towards the rear bedroom area of the apartment. Grunhard then observed Yucaitis and Byrne bring defendant out of the bedroom and into the apartment's kitchen area. Grunhard testified that he never heard defendant yell or scream while in the apartment.

Detective John Yucaitis testified that he and Sergeant Byrne were the first of many police officers to enter defendant's apartment on the morning of September 2. Yucaitis stated that he and Sergeant Byrne were also the first two officers to enter defendant's bedroom. Defendant was lying on the floor, and a loaded .357 Magnum revolver was on a night stand near where defendant was lying. According to Yucaitis, he gave defendant a quick pat-down search, picked him up, and took defendant into the apartment's kitchen area, where defendant was advised of his *Miranda* rights. Yucaitis testified that defendant then began to give a statement, implicating himself in the crimes at the Pueschel residence. However, Yucaitis admitted that the report he filed in connection with this case did not reflect that defendant made such a statement at the apartment. Yucaitis testified that he remained with defendant from the time defendant was brought into the kitchen, and denied that he struck or kicked defendant in the apartment.

According to Detective Yucaitis, after exiting the apartment, he placed defendant in the back seat of a police vehicle and was alone in the car with defendant until he picked up his partner, Detective Edmond Leracz, at another location. Thereafter, they all proceeded to Area 2. Yucaitis testified that defendant confessed in the car, but Yucaitis stated that he did not record this confession in his report. Detective Yucaitis denied striking defendant while he was in the vehicle.

Detective Yucaitis further testified that when they arrived at Area 2, he took defendant into interview room

No. 1, and shackled defendant's left wrist to the wall. Yucaitis testified that when he was alone with defendant in this room, defendant again confessed to the crimes. Yucaitis stated that Assistant State's Attorney Miller then arrived. Yucaitis denied that he struck, kicked or hit defendant at any time while defendant was at Area 2. Yucaitis also denied placing a plastic bag over defendant's head, or instructing defendant what to say in his confession. Yucaitis testified that he was defendant's "babysitter" from the time defendant arrived at Area 2 until defendant gave his court-reported statement. Yucaitis stated that "[t]he majority of the time I was with him. If I wasn't with him, he was alone." Detective Edmond Leracz also testified on behalf of the State. Leracz initially observed defendant in the back seat of a police vehicle when Leracz's partner, Detective Yucaitis, picked him up from a location on Chicago's west side. Leracz testified that at that time, defendant's hands were cuffed behind him, and that Leracz changed the handcuffs to the front. Leracz then sat in the vehicle's passenger seat, and stated that at no time did he strike defendant. Leracz testified that he had no knowledge of whether defendant was struck prior to the time he entered the vehicle. Leracz also testified that, during the ride to Area 2, defendant confessed to the Pueschel murders, although Leracz admitted that he did not record this confession in any of his reports.

The State recalled Irving Miller, who testified that a Polaroid photograph was taken of defendant on September 2, 1983, at approximately 6:35 to 6:40 p.m. by a Chicago police department evidence technician. Miller described the photograph as showing defendant seated behind a table, fully dressed, and that no injury to defendant was apparent. Also testifying with respect to defendant's lack of injuries was Robert Muralles, an emergency medical technician at Cook County jail. A

medical history and physical examination sheet prepared by Muralles on September 3, 1982, indicated that defendant exhibited no bruises, cuts, swelling or abrasions.

The State next called Sergeant John Byrne, and Detectives William Kurschner, Raymond Benkowski, and Charles Grunhard, who all testified that defendant was not physically abused in his apartment on the morning of September 2.

At the conclusion of the testimony, the circuit court denied defendant's suppression motion. Specifically, the circuit judge stated that his decision "boil[ed] down to a question of credibility." The circuit court found that the testimony of the police officers and former Assistant State's Attorney Miller was far more credible than that of defendant and Morriell Redmond. The court noted that all of the officers in the apartment testified that at no time did they observe, or become aware of, any beatings of defendant. The court also noted that Detectives Yucaitis and Leracz testified that they did not strike defendant in the car on the way to the police station.

As to the alleged beatings at Area 2, the circuit court observed that defendant testified that the officer who hit him in the kitchen of his apartment and in the police car was the same officer who hit him with a flashlight, put a bag over his head, and beat his head against the wall in an interview room at Area 2 police headquarters. The circuit court concluded that the evidence showed that the only officer who had custody of defendant at Area 2 was Detective Yucaitis, and, therefore, the only person who could have struck defendant was Yucaitis. Noting that Yucaitis vehemently denied defendant's allegations, the circuit court judge concluded that "Detective Yucaitis' testimony is far more credible than the self-serving statements of the defendant in this regard," and found that "Detective Yucaitis did not beat the defendant at any time while he was in the police station, did not hit

him with a flashlight, did not put a bag over his head and did not hit his head against the wall." In support of this conclusion, the circuit court also found it significant that former Assistant State's Attorney Miller asked defendant outside the presence of officers, as well as during defendant's court-reported statement, whether he had been abused by the police and defendant replied that he had not. Finally, the circuit court also noted in the course of its ruling that defendant had never complained to anyone at the police station about the torture, and that there was no physical evidence of injury. The circuit court then ruled that the post-arrest statements made by defendant were admissible during his trial.

Defendant was tried by a jury in 1985 and was convicted of the murders of Jo Ellen and Dean Pueschel, and of the attempted murder of their son, Richard. Defendant was also found guilty of several other felonies relating to the break-in at the Pueschel's apartment. At a separate sentencing hearing, the jury determined that defendant was eligible for the death penalty, and found that no factors in mitigation were sufficient to preclude imposition of the death sentence. Defendant was sentenced to death on the capital offenses, and received terms of imprisonment for his noncapital convictions. On direct appeal, this court reversed defendant's convictions and sentences, and remanded the cause to the circuit court for a new trial and sentencing hearing. *People v. Mahaffey*, 128 Ill. 2d 388, 409-12 (1989). This court determined that the circuit court's failure to sever defendant's trial from that of his codefendant brother, Jerry Mahaffey, constituted reversible error.

On remand, defendant expressed his desire to represent himself during all subsequent proceedings. The circuit court conducted a fitness hearing, and found that defendant was fit to stand trial. Thereafter, defendant formally waived his right to the assistance of counsel for

purposes of both the trial and the capital sentencing hearing. The circuit court, however, appointed two public defenders to act as defendant's "legal advisors" during the proceedings to answer defendant's legal questions. Defendant's second trial occurred in 1991, and, at the conclusion of the proceedings, a jury again found defendant guilty of the murders of Jo Ellen and Dean Pueschel, and of the attempted murder of Richard Pueschel. The jury also convicted defendant of home invasion, rape, armed robbery, aggravated battery to a child, residential burglary, and theft (over $300). After a separate sentencing hearing, the jury found that defendant was eligible for the death penalty, and that there were no mitigating circumstances sufficient to preclude imposition of the death sentence. Defendant was sentenced to death for the murder convictions, and received an extended term of 60 years' imprisonment for the attempted murder conviction of Richard Pueschel. The judge also imposed consecutive 30-year sentences for home invasion, armed robbery, and rape. Defendant's convictions and sentences were affirmed on direct appeal by this court. *People v. Mahaffey*, 166 Ill. 2d 1 (1995). Thereafter, the United States Supreme Court denied defendant's petition for a writ of *certiorari*. *Mahaffey v. Illinois*, 516 U.S. 1002, 133 L. Ed. 2d 450, 116 S. Ct. 547 (1995).

On June 30, 1995, post-conviction counsel filed a petition for post-conviction relief, alleging that defendant's constitutional rights were violated during his trial and on direct appeal. In 1996, different post-conviction counsel filed a first, second, and third supplemental petition for post-conviction relief. On September 17, 1997, the circuit court conducted a hearing to determine whether defendant was fit for post-conviction proceedings. At the conclusion of the proceedings, the court found defendant to be fit. On that date, leave was granted to allow post-conviction counsel to file an amended post-conviction petition.

An amended petition for post-conviction relief was filed on October 27, 1997. In this amended petition defendant, for the first time during post-conviction proceedings, raised the claim that new evidence supported his allegations that he had been subjected to brutality by Chicago police officers, and that his confession had been coerced. The petition stated that "[o]n May 9, 1997, documents were made available for the first time that are critically important to this case because they show nearly identical acts of abuse, brutality, and falsification of evidence by the same officers who investigated [defendant's] case." The petition references a May 9, 1997, order entered by the United States district court in the federal civil rights action of *Wiggins v. Burge*, 173 F.R.D. 226 (N.D. Ill. 1997), wherein the court struck the confidential designation of several documents produced by the City of Chicago during discovery. Among the documents released from a protective order was a report prepared by the Chicago police department's Office of Professional Standards (OPS), which surveyed alleged systematic abuse of suspects in custody at Area 2 police headquarters and which named several police officers involved in cases of abuse, some of whom participated in defendant's arrest and interrogation.

Among other claims, defendant's amended post-conviction petition alleged that the State violated defendant's rights to due process and a fair trial by concealing evidence favorable to him and material to his motion to suppress, in violation of *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed 2d 215, 83 S. Ct. 1194 (1963). According to the amended petition, the prosecution withheld information about prior allegations of police torture at Area 2 made by other suspects between 1982 and 1983. The petition also alleged that "newly discovered evidence made available for the first time in May, 1997, is critically important to this case because it documents nearly

identical acts of abuse, brutality, and falsification of evidence by the same officers who investigated [defendant's] case." Defendant contends that the evidence allegedly withheld by the State in 1984, as well as the newly discovered evidence, "would have been admissible as showing the *modus operandi*" of officers assigned to Area 2, and would have probably changed the outcome of the suppression hearing and trial.

The amended petition also raised a related claim that defendant was denied effective assistance of trial counsel at the 1984 suppression hearing because trial counsel "failed to investigate and present evidence of complaints filed with the Office of Professional Standards by other victims of Chicago Police Officers involved in the arrest, search, and interrogation of [defendant]." According to defendant, the evidence revealed by such investigation, as well as the newly discovered evidence described above, would have been admissible to establish a pattern of abuse at Area 2 and to impeach the credibility of the testifying officers, and would have changed the outcome of the suppression motion and the trial.

Defendant also contended in his amended petition that the circuit court violated defendant's right to represent himself at the sentencing stage of his second trial by appointing an assistant public defender to serve as standby counsel. In addition, defendant claimed that a court-ordered fitness examination prior to sentencing deprived him of his right to remain silent.

Post-conviction counsel also filed a petition to vacate defendant's convictions and death sentence pursuant to section 2—1401 of the Code of Civil procedure (735 ILCS 5/2—1401 (West 1996)). Relying totally upon exhibits attached to, or incorporated by reference in, defendant's amended petition for post-conviction relief, the motion alleged that newly discovered evidence, made available for the first time on May 9, 1997, "documents nearly

identical acts of abuse, brutality, and falsification of evidence by the same officers who investigated [defendant's] case *** [and] would have been admissible as showing modus operandi." Defendant contends that, had this evidence been available, the outcome of the proceedings would have been different.

On February 27, 1998, the circuit court granted the State's motion to dismiss defendant's amended post-conviction petition without an evidentiary hearing, finding that defendant's claims had been waived. The circuit court also dismissed defendant's section 2—1401 motion without an evidentiary hearing on the basis that it was untimely. Defendant now appeals from the circuit court's judgment. As part of this appeal, the Campaign to End the Death Penalty was granted leave to file a brief, as *amicus curiae*, in support of defendant. 155 Ill. 2d R. 345.

## ANALYSIS

The Illinois Post-Conviction Hearing Act provides a mechanism by which criminal defendants can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution, the Illinois Constitution, or both. See 725 ILCS 5/122—1 (West 1994). An action for post-conviction relief is a collateral proceeding and not an appeal from the underlying judgment. *People v. Morgan*, 187 Ill. 2d 500, 528 (1999). In order to be entitled to post-conviction relief, a defendant bears the burden of establishing a substantial deprivation of federal or state constitutional rights in the proceedings that produced the judgment being challenged. *People v. Franklin*, 167 Ill. 2d 1 (1995).

Because a proceeding brought under the Act is a collateral attack on a judgment of conviction, all issues actually decided on direct appeal are *res judicata*, and all issues which could have been raised in the original proceeding, but were not, are waived. *People v. White-*

*head*, 169 Ill. 2d 355, 371 (1996). The doctrines of *res judicata* and waiver, however, will be relaxed in three situations: where fundamental fairness so requires; where the alleged waiver stems from the incompetence of appellate counsel; or where the facts relating to the claim do not appear on the face of the original appellate record. *Whitehead*, 169 Ill. 2d at 371-72.

A defendant is not entitled to an evidentiary hearing as of right on a post-conviction petition. *Whitehead*, 169 Ill. 2d at 370-71. An evidentiary hearing is warranted only where the allegations of the post-conviction petition, supported where appropriate by the trial record or accompanying affidavits, make a substantial showing that a defendant's constitutional rights have been violated. *Morgan*, 187 Ill. 2d at 528. For the purpose of determining whether to grant an evidentiary hearing, all well-pleaded facts in the petition and any accompanying affidavits are taken as true. *People v. Brisbon*, 164 Ill. 2d 236, 244-45 (1995). A circuit court's determination regarding the sufficiency of the allegations contained in a post-conviction petition are reviewed *de novo*. *Morgan*, 187 Ill. 2d at 528; *People v. Coleman*, 183 Ill. 2d 366, 388-89 (1998).

Defendant first contends that his constitutional right to due process of law and his right to a fair trial were violated when, during the 1984 hearing on his motion to suppress, the State failed to disclose to the defense all exculpatory evidence as required by *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). In *Brady*, the United States Supreme Court held that the prosecution must disclose evidence that is both favorable to the accused and "material either to guilt or to punishment." *Brady*, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1197; *People v. Sanchez*, 169 Ill. 2d 472, 485-86 (1996). Evidence is considered "material" if there is "a reasonable probability that, had the evidence been

disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494, 105 S. Ct. 3375, 3383 (1985); *Sanchez*, 169 Ill. 2d at 486.

According to defendant's amended post-conviction petition, in February 1984 the "State knew that several of the Chicago Police Officers intimately involved in this case" were "being investigated by the FBI, Amnesty International, and the Chicago Police Department Office of Professional Standards for their use of abusive police tactics." In addition, defendant claims that, at the time of his suppression hearing, the State withheld evidence concerning a series of other prior alleged instances in which officers assigned to Area 2 employed torture as a means of eliciting confessions from other suspects.

In support of his *Brady* claim, defendant specifically relies upon three documents attached to his amended post-conviction petition. First, defendant cites to a document filed in the federal civil rights action of Wilson v. City of Chicago. This document, entitled "plaintiff's proffer of other acts of beating torture and electroshock by defendant Burge and other detectives," was filed in mid-1989 and chronicles alleged acts of beatings and torture of suspects by officers at Area 2, including some of the officers involved in the arrest and interrogation of defendant. Second, defendant relies upon the February 1993 complaint filed in the federal civil rights action of *Wiggins v. Burge*. Similar to the information contained in the "plaintiff's proffer" cited above, this complaint details allegations of brutality and torture by suspects against officers at Area 2, both before and after defendant's arrest and interrogation. Finally, defendant relies upon the December 28, 1989, appellate court opinion in *People v. Banks*, 192 Ill. App. 3d 986 (1989), wherein the court detailed allegations made by several suspects that they had been tortured by Area 2 officers. Defendant

contends that, had the State disclosed the information contained within the above documents, it would have been admissible in establishing torture as the *modus operandi* of officers assigned to Area 2, and also in undermining the credibility of the testifying officers. Defendant concludes that the result of the proceedings would have been different had this evidence been admitted.

In response, the State accurately contends that this argument is procedurally defaulted because defendant failed to raise this issue on direct appeal. See *Whitehead*, 169 Ill. 2d at 371. However, this court may review a post-conviction claim which has not been properly preserved where fundamental fairness so requires. *Whitehead*, 169 Ill. 2d at 371-72; *People v. Franklin*, 167 Ill. 2d 1, 20 (1995). Although "[t]he concept of fundamental fairness escapes precise definition" (*People v. Porter*, 164 Ill. 2d 400, 408 (1995)), it is "generally defined in terms of a 'cause and prejudice' test." *Franklin*, 167 Ill. 2d at 15. "Cause" has been defined as "an objective factor that impeded defense counsel's efforts to raise the claim on direct review." *Franklin*, 167 Ill. 2d at 20. "Prejudice" has been defined as "an error which so infected the entire trial that the defendant's conviction violates due process." *Franklin*, 167 Ill. 2d at 20. Because we determine that no error occurred, defendant is unable to satisfy the prejudice prong of this test, and, therefore cannot invoke the fundamental fairness exception.

A review of the exhibits relied upon by defendant in his amended post-conviction petition to support his claim that the State violated the *Brady* rule reveals that these documents were not in existence at the time of the 1984 suppression proceedings, and therefore could not have been disclosed to defendant. In addition, defendant has made no showing that the information contained within the documents was available to the State at the time of the suppression hearing. Defendant has failed to present

any evidence to support his claim that there was an "investigation" of Area 2 officers by OPS or outside agencies prior to the February 1984 suppression hearing. Accordingly, defendant's argument is unavailing that the State "knew" in early 1984 that Area 2 officers were being "investigated" and failed to disclose this information. Further, defendant has provided no evidence to support his claim that in February 1984 the State was aware that there was a series of prior alleged instances in which officers assigned to Area 2 employed torture as a means of eliciting confessions from other suspects. To the contrary, the evidence presented by defendant in support of his claims indicates that any apparent nexus between alleged incidents of abuse of other suspects by Area 2 officers and defendant's claims did not arise until several years after defendant's suppression motion, and it was only at that later time that investigations were initiated into interrogation practices at Area 2. Therefore, defendant cannot properly claim that the State violated the *Brady* rule by failing to disclose information that was unavailable at the time of the suppression proceedings. See *People v. Haynes*, 192 Ill. 2d 437, 469 (2000); *People v. Hinton*, 302 Ill. App. 3d 614, 623 (1998). Under the facts presented, we find that no *Brady* violation occurred and, consequently, defendant suffered no prejudice. The circuit court properly dismissed this claim.

In his amended petition, defendant also makes the related argument that he was denied effective assistance of trial counsel during the 1984 suppression hearing. To prevail on a claim asserting that trial counsel was not effective, a defendant must first establish that "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984); *Morgan*, 187 Ill. 2d at 529. If a defendant establishes that defense counsel's representation fell below an objec-

tive standard of reasonableness, a defendant must then demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; *Morgan*, 187 Ill. 2d at 529-30. A defendant must satisfy both prongs of the *Strickland* test before he or she can prevail on a claim of ineffective assistance of counsel. However, if the ineffective assistance claim can be disposed of on the ground that the defendant did not suffer prejudice, a court need not determine whether counsel's performance was constitutionally deficient. *People v. Griffin*, 178 Ill. 2d 65, 74 (1997).

In his amended post-conviction petition, defendant alleges that his trial counsel "failed to investigate and present evidence of complaints filed with the Office of Professional Standards by other victims of Chicago Police Officers involved in the arrest, search, and interrogation of [defendant]." Defendant also contends in his amended petition that defense counsel "failed to gather and present readily available evidence of systemic police abuse in other widely reported cases involving the officers who handled the instant investigation." In support of his claim of ineffective assistance of counsel, defendant relies upon the same three documents cited in support of his claims that the State violated the *Brady* rule. According to defendant, had defense counsel discovered and presented this evidence of "systemic police torture and abuse," it not only would have been admissible in establishing that torture was routinely employed by Area 2 officers to elicit confessions, but also would have served to impeach the credibility of the testifying officers. Defendant concludes that the introduction of this evidence would have changed the outcome of the suppression motion and the trial.

In response, the State argues that this claim is procedurally defaulted because defendant failed to present it on direct appeal. However, as noted, the strict application of the waiver doctrine may be relaxed where required by fundamental fairness, which is analyzed in terms of "cause and prejudice." *Franklin*, 167 Ill. 2d at 20. Because defendant has failed to present evidence that his trial counsel was ineffective, he is unable to satisfy the prejudice prong of the fundamental fairness exception.

As stated, the documents relied upon by defendant in support of his claim that his trial counsel was ineffective during the February 1984 suppression proceedings are the same documents defendant cited in support of his claim that the State violated the *Brady* rule. As we held above with respect to defendant's *Brady* claim, the documents relied upon by defendant were not in existence at the time of the suppression hearing and, therefore, could have been neither discovered nor presented by defense counsel. In addition, defendant has provided no support for his claim that counsel failed to investigate and present evidence of complaints filed with OPS against the officers who arrested and interrogated defendant. No evidence has been presented by defendant that, prior to February 1984, complaints had been filed with OPS against the officers involved in his case by other suspects alleging abuse similar to that alleged by defendant. Finally, defendant has failed to provide any support for his assertion that, in February 1984, there was "readily available evidence of systemic police abuse in other widely reported cases" involving some of the officers who arrested and interrogated defendant. Rather than supporting defendant's position, defendant's own exhibits establish that such information was not "readily available" until years after defendant's suppression hearing, and it was only at that time that "systemic" abuse at

Area 2 became "widely reported." Accordingly, under the facts presented, we find that defendant has presented no evidence to support his claim that his trial counsel was ineffective. Consequently, defendant suffered no prejudice, and he cannot invoke the fundamental fairness exception. The circuit court properly dismissed this claim.

Defendant's amended petition also presents the broader claim that new evidence supports his assertion that his confession was coerced and involuntary, making its introduction at trial a violation of his constitutional rights. See *People v. King*, 192 Ill. 2d 189 (2000). In his amended post-conviction petition, defendant relies on material outside the trial record to argue that, had this now-available information been before the circuit court at the time of his suppression hearing, the circuit court would have suppressed his confession. Defendant further asserts that, had his confession been suppressed at trial, he "would probably have been acquitted." Defendant contends that the circuit court erred in denying him an evidentiary hearing on this post-conviction claim.

According to defendant's amended post-conviction petition, "newly discovered evidence made available for the first time in May, 1997, is critically important to this case because it documents nearly identical acts of abuse, brutality, and falsification of evidence by the same officers who investigated [defendant's] case." The amended petition makes reference to a May 9, 1997, order entered by the United States district court in *Wiggins v. Burge*, 173 F.R.D. 226 (N.D. Ill. 1997). The *Wiggins* order followed the settlement of a federal civil rights action against the Chicago police department alleging torture of suspects by police officers at Area 2. The order also struck the confidential designation of several documents produced by the City of Chicago during discovery. Citing the public interest in the disclosure of these documents, the

district court removed a protective order from OPS investigative files, administrative reviews, recommendations and findings in 11 alleged Area 2 police torture cases. The court also disclosed a report prepared by OPS, which surveyed alleged systematic abuse of suspects in custody at Area 2 police headquarters and which named several police officers allegedly involved in cases of abuse, some of whom participated in defendant's arrest and interrogation.

Included among the documents attached as exhibits to defendant's amended post-conviction petition are the OPS report, as well as the findings and decision of the police board of the City of Chicago with respect to Area 2. Specifically, the board discharged Commander Jon Burge from the Chicago police force after finding him guilty of physically abusing Andrew Wilson. We parenthetically note that there is no evidence of record that Burge was involved in any aspect of the arrest and questioning of defendant at bar. We also note that Detective Yucaitis, the only officer specifically implicated by defendant as abusing him, was given a 15-month suspension for failing to stop or report the abuse of Wilson by Burge, but was not found by the board to have participated in any abuse. Also attached to the amended petition is an unpublished state appellate court opinion in which the court affirmed the police board's findings and decision. *O'Hara v. Police Board*, Nos. 1—94—0999, 1—94—2462, 1—94—2475 cons. (1995) (unpublished order under Supreme Court Rule 23).

The State counters that defendant's claim is barred by waiver, as defendant failed to raise this issue on direct appeal. We disagree. Defendant's claim rests upon post-conviction disclosures by the City of Chicago and the Chicago Police Department which occurred after defendant's trial. As such, the information upon which defen-

dant relies is clearly outside the trial record upon which this court's ruling on direct appeal was based. Because the rules of procedural default are relaxed where the facts relating to defendant's claim do not appear on the face of the record, the merits of defendant's claim are properly considered. *Haynes*, 192 Ill. 2d at 466; *People v. Hobley*, 182 Ill. 2d 404, 437-38 (1998); *People v. Orange*, 168 Ill. 2d 138, 167 (1995).

We find that the trial court properly dismissed defendant's claim without an evidentiary hearing. In order for newly discovered evidence to warrant a new trial, the evidence must be "of such conclusive character that it will probably change the result on retrial." *People v. Patterson*, 192 Ill. 2d 93, 124 (2000); *Hobley*, 182 Ill. 2d at 449. We disagree with defendant's assertion that the now-available evidence of other alleged incidents of abuse and torture at Area 2 would alter the result on retrial because it would corroborate his claim that his confession was the result of police abuse. To the contrary, our review of the record in this matter reveals that, in light of the overwhelming evidence of defendant's guilt, there is no reasonable probability that the outcome of defendant's trial would have been different had defendant's confession not been admitted into evidence. Therefore, we conclude that defendant suffered no prejudice as a result of the claimed error.

Apart from defendant's confession, the State presented evidence at trial to prove defendant guilty beyond a reasonable doubt. Richard Pueschel, who was 11 years old at the time of the offenses and was 18 at the time of trial, provided an in-court identification of defendant as one of two men he saw in the apartment the night of the crimes, testifying that he was "99% sure" that defendant was there. "99% sure" may not be sufficient identification of defendant as the perpetrator of the crime, particularly in a capital case. However, Richard

Pueschel's identification of defendant is corroborated by evidence that at the time of his arrest, shortly after the murders were committed, defendant was in possession of jewelry and weapons taken from the Pueschel home at the time of the commission of the crimes. Specifically, the jury heard evidence that numerous items of personal property which were stolen from the Pueschel's residence were found in defendant's apartment, including two dozen pieces of jewelry identified as belonging to either Jo Ellen, Dean or Richard Pueschel. The jury also heard evidence that, at the police station following defendant's arrest, defendant removed a man's ring from his hand and a watch from his back pocket, stating that these items belonged with the other pieces of property that had been seized from his apartment. The ring and watch were identified at trial as also belonging to Dean Pueschel. In addition, the loaded .357 Magnum revolver recovered from defendant's night stand, as well as a shotgun recovered from defendant's closet, were identified as belonging to the Pueschels. Under the totality of the evidence, our review of this record convinces us that in light of the overwhelming evidence establishing defendant's guilt, confidence in the outcome of defendant's trial is not undermined, even assuming the claimed error.

We find the instant cause factually distinguishable from our recent decision in *People v. Patterson*, 192 Ill. 2d 93 (2000), wherein the defendant presented a similar argument that newly discovered evidence supported the theory that his confession was the product of coercion by police officers assigned to Area 2. In *Patterson*, the new evidence relied upon by the defendant consisted of many of the same documents which are attached to the amended post-conviction petition filed by defendant in the instant cause. We concluded in *Patterson* that, in light of this now-available evidence, an evidentiary hear-

ing was warranted on Patterson's allegations of police misconduct. However, in *Patterson*, we noted that the evidence identifying the defendant as the perpetrator of a double murder "consisted of (1) the oft-changing testimony of a teenager whose cousin had been a suspect in the crime; and (2) the testimony from the police officers and assistant State's Attorneys concerning defendant's confession." *Patterson*, 192 Ill. 2d at 122. Unlike in *Patterson*, where the defendant's confession was the principal piece of evidence supporting his convictions, in the matter at bar there is sufficient evidence of defendant's guilt, apart from his confession.

We also reject defendant's related argument that his petition to vacate defendant's convictions and death sentence pursuant to section 2—1401 of the Code of Civil Procedure (735 ILCS 5/2—1401 (West 1996)) was improperly dismissed by the circuit court without an evidentiary hearing. Defendant's section 2—1401 motion relies totally upon exhibits attached to, or incorporated by reference in, defendant's amended post-conviction petition, and raises the virtually identical "new evidence" claim as presented in defendant's amended petition.

A section 2—1401 petition for relief from a final judgment is the forum in a criminal case in which to correct all errors of fact occurring in the prosecution of a cause, unknown to petitioner and the court at the time judgment was entered, which, if then known, would have prevented its rendition. *Haynes*, 192 Ill. 2d at 460; *People v. Berland*, 74 Ill. 2d 286, 313-14 (1978). However, where a section 2—1401 petition is filed more than two years after the judgment was entered, it cannot be considered. 735 ILCS 5/2—1401(c) (West 1996); *People v. Caballero*, 179 Ill. 2d 205 (1997). It is well established that the two-year limitation period mandated by section 2—1401 must be adhered to in the absence of a clear showing that the person seeking relief is under legal disability or duress or

the grounds for relief are fraudulently concealed. *Caballero*, 179 Ill. 2d at 210-11.

Defendant's section 2—1401 petition was filed in October 1997, more than six years after he was tried and convicted in 1991. In his brief to this court, defendant merely makes passing reference to this motion, and does not specifically argue that any of the grounds for tolling the limitations period exist. Therefore, section 2—1401 is not available as a remedy. *Caballero*, 179 Ill. 2d at 211. In addition, even if defendant's section 2—1401 motion had been timely presented, as stated above with respect to the identical claim made in defendant's amended post-conviction petition, defendant has failed to establish that the new evidence would have changed the outcome of the proceedings. The circuit court appropriately dismissed this motion.

Defendant's final argument in respect to his post-conviction petition is that the circuit court erred in dismissing, without an evidentiary hearing, defendant's claims that his constitutional rights were violated during the sentencing phase of his trial. After defendant was convicted, but before the start of the sentencing phase of the proceedings, the circuit court readmonished defendant concerning his right to be represented by counsel. The circuit court reminded defendant that attorneys from the public defendant's officer had been appointed as his "legal advisors," and that defendant had the option of allowing them to represent him during sentencing. Defendant initially indicated that he wished to continue to represent himself during the sentencing proceedings. However, defendant, in open court, then inquired of one of his "legal advisors" whether counsel could "come up with some evidence I can't come up with." Counsel replied: "[b]ecause the defendant has asked me a question in open court, it is my feeling, having a conversation with [defendant] in the lockup approximately 20 minutes

ago, that he does not comprehend what is going on at this time. He's not fit for sentencing." The circuit court then ordered that defendant be examined for fitness. A psychiatric examination of defendant was performed by Dr. Robert Reifman, who concluded that defendant was fit for sentencing. Thereafter, the circuit court allowed defendant to waive his right to counsel and to represent himself during the sentencing proceedings. The State then presented Dr. Reifman at the second stage of the sentencing hearing as a witness in aggravation. Dr. Reifman testified that defendant had an antisocial personality disorder, but that defendant was not suffering from a mental disease.

On direct appeal to this court, defendant argued that, pursuant to *Estelle v. Smith*, 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866 (1981), he was entitled to receive *Miranda* warnings at the outset of the psychiatric examination. Defendant contended that, because no warnings were given, the State improperly introduced evidence from Dr. Reifman's examination of defendant. We held that defendant had waived this issue, and also determined that the issue did not rise to the level of plain error. *Mahaffey*, 166 Ill. 2d at 27. The evidence at the second stage of the defendant's sentencing hearing was not closely balanced, as defendant introduced no evidence in mitigation while the State, in contrast, presented extensive evidence in aggravation. *Mahaffey*, 166 Ill. 2d at 27. We also determined that the alleged error was not substantial. We noted that *Estelle* had only limited application to the facts presented here, and that the jury could have as likely considered the content of Dr. Reifman's testimony in mitigation as in aggravation. *Mahaffey*, 166 Ill. 2d at 27-28.

Defendant, urging us to "revisit the issue," now raises the same argument in his post-conviction petition that he raised on direct appeal that the court-ordered fit-

ness examination prior to sentencing deprived him of his right to remain silent because he was examined by Dr. Reifman without first being given *Miranda* warnings. The State contends that this issue is barred by the doctrine of *res judicata* as a result of this court's decision on direct appeal. We agree. In a post-conviction proceeding, determinations of the reviewing court on the prior direct appeal are *res judicata* as to all issues actually decided. *Whitehead*, 169 Ill. 2d at 371. Defendant contends, however, that considerations of fundamental fairness require that we relax the *res judicata* bar. We disagree. As stated, fundamental fairness is usually analyzed in terms of "cause and prejudice." See *Franklin*, 167 Ill. 2d at 20-21. Defendant has failed to provide argument or facts sufficient to support the cause and prejudice requirements of the fundamental fairness exception. Defendant simply offers the bald assertion that fundamental fairness overrides the *res judicata* doctrine. Accordingly, we determine that defendant's claim is barred. See *Franklin*, 167 Ill. 2d at 15.

In his amended post-conviction petition, defendant also raises the related argument that he was denied his right to represent himself at the sentencing stage of his trial, as guaranteed by *Faretta v. California*, 422 U.S. 806, 807, 45 L. Ed. 2d 562, 566, 95 S. Ct. 2525, 2527 (1975). According to defendant's brief, the assistant public defendant who was acting as his "legal advisor" and who requested that defendant be evaluated for fitness, was actually representing "the trial court, not [defendant], who was representing himself." Defendant argues that "in allowing standby counsel to initiated [*sic*] an examination that boomeranged on [defendant], the trial court violated [defendant's] right to represent himself."

The State responds that consideration of this claim is barred by both *res judicata* and waiver. We agree. That portion of defendant's claim which asserts that the ex-

amination "boomeranged" on defendant is simply a recasting of the argument rejected on direct appeal concerning the introduction of Dr. Reifman's testimony at sentencing. A defendant cannot circumvent the doctrine of *res judicata* and obtain post-conviction relief simply by rephrasing issues previously addressed on direct appeal. *People v. Emerson*, 153 Ill. 2d 100, 107-08 (1992). The State also correctly contends that the remainder of the claim is waived because defendant never argued on direct appeal that his right to self-representation was violated during the sentencing proceedings. See *Whitehead*, 169 Ill. 2d at 371. Defendant also urges that we should ignore the procedural bar as to this portion of his claim on the basis of fundamental fairness. See *Franklin*, 167 Ill. 2d at 20-21. Defendant, however, simply asserts that fundamental fairness overrides waiver. We conclude that defendant has failed to satisfy the cause and prejudice requirements of the fundamental fairness exception. Therefore, we determine that defendant's claim is barred. *Franklin*, 167 Ill. 2d at 15.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County dismissing defendant's amended petition for post-conviction relief. We hereby direct the clerk of this court to enter an order setting Thursday, January 11, 2001, as the date on which the sentence of death entered by the circuit court of Cook County is to be carried out. The defendant shall be executed in the manner provided by law (725 ILCS 5/119—5 (West 1994)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Tamms Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*

CHIEF JUSTICE HARRISON, concurring in part and dissenting in part:

I agree that Mahaffey's convictions should not be disturbed. In my view, however, his sentence of death cannot be allowed to stand. For the reasons set forth in my partial concurrence and partial dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), the Illinois death penalty law violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). Mahaffey's sentence of death should therefore be vacated and he should be sentenced to a term of imprisonment. Ill. Rev. Stat. 1981, ch. 38, par. 9—1(j). Because Mahaffey was found guilty of murdering more than one victim, the term of his imprisonment must be natural life. Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1)(c).